DOW JONES & COMPANY,
INC., Plaintiff,

v.

HARRODS, LIMITED and Mohamed
Al Fayed, Defendants.

No. 02 Civ. 3979(VM).

United States District Court.
S.D. New York.

Oct. 11, 2002.

398

Jack M. Weiss, Gibson, Dunn & Crutcher, L.L.P., New York City, for Plaintiff.

Zachary Carter, Bruce R. Ewing, Lile Deinard, Dorsey & Whitney LLP, New York, NY, for Defendants.

## DECISION AND ORDER

MARRERO, District Judge.

### TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 399

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 399
 A. FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 399
 B. THE ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402

II. STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 404

III. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 404
 A. ACTUAL CONTROVERSY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 406
 1. Meaning and Scope of Actual Controversy . . . . . . . . . . . . . . . . . . . . . . . . . 406
 2. The Actual Controversy Standard Applied . . . . . . . . . . . . . . . . . . . . . . . . . 407
 3. First Amendment Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 409
 4. Intercourt Conflict and Comity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 410

 5. Other Case Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 413
 B. PURPOSES OF THE DJA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418
 1. Constitutional Dimensions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418
 2. Antisuit Injunctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 420
 3. Concurrent Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 421
 a. Jurisdictional Basis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 421
 b. Basis for Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 422
 4. Preemptive Judgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 425
 5. Unique Complexities of Public Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . 427
 C. COURT DISCRETION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 431
 1. Resolution of the Controversy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 437
 2. Useful Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 439
 3. Forum Shopping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 439
 4. Conflict with Another Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 440
 5. Adequate Alternate Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 442
 a. Pendency of Another Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 442
 b. Comity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 443
 c. Exception to Comity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 446

IV. PERSONAL JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 447

V. ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 447

Plaintiff Dow Jones & Company, Inc. ("Dow Jones") brought this action against defendants Harrods, Limited ("Harrods") and Mohamed Al Fayed ("Al Fayed") requesting a declaratory judgment and injunctive relief. Dow Jones seeks to preclude Harrods and Al Fayed from pursuing claims for defamation asserted in a lawsuit Harrods commenced against Dow Jones in the United Kingdom arising from the publication of an article in *The Wall Street Journal* (the *"Journal"*) in April of this year. Now before the Court is a motion by Harrods and Al Fayed, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2), to dismiss the complaint. At issue is whether the federal Declaratory Judgment Act (the "DJA") may be applied for the purpose of the judgment Dow Jones seeks, or whether, assuming the DJA were properly invoked, based on the facts presented here the Court should exercise its discretion under the DJA to grant or deny declaratory relief. For the reasons discussed below, the motion is granted.

## I. BACKGROUND

### A. FACTS

To the question "What is in a joke?", this lawsuit gives a decidedly wooden answer: a federal case.[1] Beyond the purported humor that gave rise to the conflict, however, lie several serious questions entailing federal statutory and constitutional law, as well as issues of weighty international dimensions.

The action began with an April Fool's joke. Harrods, which, among various other commercial enterprises, operates the well-known department store of that name

---

[1] In defense of the dignity of the Court, and not to mock or diminish in any way its lofty jurisdiction, under some circumstances, as the outcome here suggests, the high threshold of federal judicial authority may not be crossed even in a case presenting the qualifying distinction of a dispute over the exchange of not just one but *two* jokes, at least one of which arises from an April Fool's gag played in a foreign country, and which then raises the stakes to entail international consequences implicating the protection of speech under the First Amendment of the United States Constitution.

in London, England, issued a press release on March 31, 2002, headlined "Al Fayed Reveals Plan to 'Float' Harrods." The release stated that Al Fayed, Harrods' Chairman and effective owner, would issue on the following day an important announcement "about his future plans for the world-famous store," including "a first-come-first-served share option offer."[2] Journalists seeking further comment were directed to contact "Loof Lirpa" at Harrods. In fact, "Loof Lirpa" is "April Fool" spelled backward. On April 1, 2002, the planned announcement posted on the designated website described Al Fayed's decision to "float" Harrods by building a ship version of the store to be moored in London on the embankment of the Thames River. The announcement included a limited offer of "shares in this exciting new venture." Persons who registered on the website by noon that day, "the first of April!", were promised "a share certificate."[3]

Dow Jones read the March 31 press release as purporting to announce that

Harrods planned to "float shares," *i.e.*, a public offering of stock. It did not wait to see Harrods' actual disclosure on the announcement date. Instead, on April 1, in the print editions of the *Journal* in the United States, and in the *Journal's* website "WSJ.com.," Dow Jones published an article reporting that Harrods would disclose plans that day to publicly list the company's shares.[4]

Upon learning that Harrods' announcement had been an April Fool's joke, the *Journal* published a correction so advising its readers in an item that appeared in its April 2, 2002 print editions in the United States as well as on WSJ.com. Three days later, Dow Jones countered with a story it asserts was intended as the *Journal's* own brand of wry, light-hearted humor, the article that ultimately catapulted into the conflict now before this Court. The *Journal's* "Deals & Deal Makers: Bids & Offers" column on April 5, 2002 published an item entitled "The Enron of Britain?" (the "April 5 Article").[5] The first sentence of the April 5 Article, which appeared in the

---

2. Declaration of Lile Deinard in Support of Motion to Dismiss, dated June 18, 2002 ("Deinard Decl.") Ex. B. The full text of the press release reads:

> AL FAYED REVEALS PLAN TO "FLOAT" HARRODS
> Harrods Chairman, Mohamed Al Fayed, will tomorrow make an important announcement about his future plans for the world-famous store. The announcement is featured on the new version of alfayed.com which launches tomorrow, Monday April 1, 2002 at 00:01. It will include a first-come-first-served share option offer.
> The information may help those journalists who have speculated during the last few months as to the future direction of Harrods. The announcement will only be posted on the website until 12 noon on April 1st. To view the information, log on to alfayed.com and click on the Harrods story on the home page. The re-launched alfayed.com is Mr. Al Fayed's personal website and gives the visitor the opportunity to learn a little more about Mr. Al Fayed: his life, his beliefs and his thoughts.
> — ends -

For further comment, please contact LOOF LIRPA at Harrods on 020 7225 5785.

3. Deinard Decl. Ex. C.

4. Deinard Decl. Ex. D at 2.

5. Deinard Decl. Ex. F. The full text of the April 5 Article reads:

> The Enron of Britain?
> If Harrods, the British luxury retailer, ever goes public, investors would be wise to question its every disclosure.
> Harrods made "news" at the beginning of this week, when the London department-store operator announced it was about to sell shares publicly. Some news organizations picked up the news item, including *The Wall Street Journal* in a news-briefs column—but it was all an April Fools' joke. The gimmick was a promotion for the Web site of Mohamed Al Fayed, the company's chairman. Clues that it was a joke included the fact that the contact person listed to get more information was Loof Lirpa— April Fool spelled backward.

*Journal*'s United States print edition and on WSJ.com., states that: "If Harrods, the British luxury retailer, ever goes public, investors would be wise to question its every disclosure." It then detailed the April Fool's joke, which the story reported had been mistaken by "some news organizations" as an announcement of a plan to sell Harrods shares publicly. Dubbing the prank "[n]ot exactly Monty Python-level stuff," the column questioned whether Harrods could "get in trouble for messing with the facts?" by issuing the bogus press announcement.

At this point the lawyers entered. Promptly the face of comedy began to furrow and its smile to curl into what often becomes tragedy's first sour frowns and snarls: incipient litigation. As the lawyers recount the tale, Harrods apparently did not see any humor in the article, and rather took umbrage from the *Journal*'s reference to it and Enron in the same breath. On April 10, 2002, Harrods' director of legal affairs wrote to Dow Jones officials asserting that the April 5 Article had enraged Harrods and "caused serious damage to Harrods' reputation worldwide" by "linking Harrods (a law abiding and historic British institution) with Enron" and thereby insinuating that Harrods "can and will act unlawfully." [6] The letter demanded that the *Journal* publish a correction and an apology in its domestic and international editions and pay Harrods "substantial damages." [7] It also explained that Harrods' April Fools Day jest followed a long-standing tradition practiced in Britain by other prominent businesses that issued similar humorous press releases. [8]

Attorneys for the two sides then exchanged numerous letters and communications articulating the parties' respective positions. On April 15, 2002, Dow Jones responded to Harrods' letter, denying that the April 5 Article was defamatory and asserting Dow Jones' view that the item was intended as humorous commentary, that the mention of Enron merely reflected "tongue-in-cheek hyperbole," and that because there was nothing inaccurate in the report there was nothing that needed correction. [9] Dow Jones suggested that Harrods submit a letter to the *Journal*'s editor for publication. [10]

Harrods replied on Arpil 18, 2002. It rejected Dow Jones' contention that the April 5 Article was meant to be humorous as "simply an incredible, if not bizarre, assertion," and reiterated Harrods' demand for a published apology, warning of Harrods' intent to commence a defamation suit in the United Kingdom if Dow Jones

---

Not exactly Monty Python-level stuff. But Harrods was pleased with itself. "The reason we played out this April Fools' joke was to draw people's attention" to the relaunched and redesigned Web site, says Peter Willasey, corporate communications director for Harrods. "We have no plans" to issue shares.

Can Harrods get in trouble for messing around with the facts? It is a private limited company. As such, its actions aren't under the aegis of the Financial Services Authority, the U.K.'s securities regulator. A spokesman for Companies House, an agency of the Department of Trade and Industry responsible for regulating corporate governance in the U.K., said the body wasn't aware of any complaints.

As of yesterday, Harrods hadn't calculated the number of hits that Mr. Al Fayed's Web site obtained to gauge the success of the bogus release. Mr. Willasey says: "Mr. Al Fayed is delighted it has been picked up all around the world."

6. First Amended Complaint for Declaratory Judgment and Injunction ("Compl.") ¶ 27.

7. *Id.*

8. Deinard Decl. Ex. G at 2.

9. Deinard Decl. Ex. A ¶ 19.

10. Compl. ¶ 28.

failed to satisfy Harrods' demands.[11] Dow Jones replied on April 19, 2002. It asserted that the April 5 Article contained only non-actionable opinion grounded on disclosed which could not serve as grounds for a defamation action, and repeated Dow Jones' willingness to publish a letter to the editor if Harrods submitted one.[12]

Dow Jones next heard from Harrods' London solicitors on May 13, 2002. The correspondence informed Dow Jones that in preparation for filing a defamation suit in the United Kingdom, Harrods requested Dow Jones to provide certain "pre-action disclosure" concerning the circulation of the *Journal*'s United States edition in the United Kingdom, the number of subscribers to its online edition in the United Kingdom and worldwide and the number of "hits" received on WSJ.com since April 5, 2002. The letter fixed a date of May 27, 2002 for disclosure of the requested information, after which Harrods would bring the matter to the appropriate court in London.[13]

Dow Jones construed the demand from Harrods' solicitors for pre-action disclosures as a threat and prelude to litigation.[14] Dow Jones did not respond to Harrods' request for disclosure. Instead, it commenced the instant action against Harrods and Al Fayed in this Court on May 24, 2002. With regard to Al Fayed, Dow Jones asserts that although no threat of

litigation had yet derived from Al Fayed himself, Dow Jones believes it faces a genuine threat because, as Chairman and owner of Harrods, "Al Fayed might well assert a claim for defamation against Dow Jones based on the April 5 Article."[15]

Harrods proceeded to institute litigation in the High Court of Justice in London (the "London Action") on May 29, 2002 seeking damages for libel arising out of the *Journal*'s publication of the April 5 Article.[16] Harrods later filed further particulars in the London Action specifying that it also sought an injunction against continued publication of the April 5 Article.[17] Al Fayed is not a party to the London Action.

## B. *THE ARGUMENTS*

Dow Jones argues that an action for defamation based on the April 5 Article would be summarily dismissed under federal and state constitutional law of any American jurisdiction because the publication comprises only the author's non-actionable expression of opinion based on true statements and contains no facts capable of being proved false. By contrast, according to Dow Jones, the London Action may proceed against it under various longstanding principles of British law that are plainly antithetical to historic rules, traditions and policies established to protect free speech and freedom of the press in the United States.[18] Under these cir-

---

11. Compl. ¶ 30; Deinard Decl. Ex. I at 1–2.

12. Compl. ¶ 31.

13. *See id.* ¶ 32.

14. *Id.* ¶ 33.

15. *Id.*

16. *Id.* ¶ 35.

17. *Id.* ¶ 36.

18. As examples, Dow Jones asserts that under British law: (1) the burden of proving truth of defamatory statements falls on the defendant;

(2) defamation is a strict liability tort and plaintiff need not prove that the defendant acted with any fault, in contrast with the "actual malice" standard that applies under American First Amendment principles; (3) protection for expression of opinion is severely limited; (4) only limited protection is available for statements about public officials or public figures; (5) aggravated damages are permitted for asserting certain defenses, for example, a defendant's seeking to justify the publication; (6) plaintiff's attorneys fees and costs must be paid by the unsuccessful defendant; (7) multiple, repetitive suits are allowed for each individual publication, for example,

cumstances, Dow Jones maintains that, absent intervention by this Court, in defending the London Action Dow Jones would be compelled to incur enormous expenses and divert its editors and writers from their journalistic endeavors, and to operate with the uncertainty as to whether it may continue to publish the April 5 Article or face potential liability on account of it.

Accordingly, Dow Jones asks this Court to exercise its jurisdiction under the DJA to adjudicate the dispute. The judgment Dow Jones seeks would declare that any libel claim based on the April 5 Article would be insufficient as a matter of law on the grounds that the story contains no provably false statements of fact and represents only protected expressions of opinion, and that Harrods could not prove that Dow Jones acted with actual malice or gross irresponsibility in publishing it. Moreover, by reason of the running costs it would continue to incur, and the perceived threat of restrictions on its continued publication of the April 5 Article, Dow

Jones requests an injunction barring Harrods and Al Fayed from pursuing the London Action or related litigation against Dow Jones in any other forum in the world.

Harrods counters that the Court lacks subject matter jurisdiction over Dow Jones' action because: (1) declaratory judgment relief is not the proper mechanism to resolve tort claims such as the defamation action underlying the parties' dispute; (2) Dow Jones' action represents a forum-shopping pre-emptive first strike brought in anticipation of a suit by Harrods—the natural plaintiff in this matter—which reflects a purpose not contemplated by the declaratory judgment statute; and (3) granting declaratory judgment to prevent Harrods from enforcing any recovery it may obtain in the London Action and to bar Al Fayed from instituting future litigation based on the April 5 Article would be improper because, on the basis of these contingent events alone, no "actual contro-

for different media or various places of publication. (*See* Memorandum in Opposition to Motion to Dismiss, dated July 8, 2002 ("Pl.'s Memo"), at 9–11, attaching the Declaration of Mark Stephens, Esq., dated 8 July 2002 ("Stephens Decl.") ¶ 5, at 2–4.). *See also Matusevitch v. Telnikoff*, 877 F.Supp. 1, 4 (D.D.C. 1995); *Bachchan v. India Abroad Publications Inc.*, 154 Misc.2d 228, 585 N.Y.S.2d 661, 663–65 (1992).

Harrods countered with a statement by its solicitor in the London Action taking issue with Dow Jones' characterization of English law. (Declaration of James Price in Support of Motion to Dismiss, dated 15 July 2002 ("Price Decl.")). According to this declaration, two recent events have produced significant reforms in the English law of defamation: the passage of the Defamation Act of 1996 and of the Human Rights Act of 1998, which incorporated into English law the European Convention for the Protection of Human Rights. The combined effect of these development, Harrods contends, is to do away with many of the antiquated "Victorian" principles reflected in the earlier defa-

mation law cited by Dow Jones. (*See* Price Decl. ¶¶ . 3–17.)

For the purposes of deciding the instant motion, the Court need not resolve which version of English law better comports with prevailing British jurisprudence. It suffices for the Court to note that at minimum it is persuaded by the sharp dispute between the parties' English law experts that it is all the more uncertain how the court in the London Action would adjudicate the case or what legal principles any other British tribunals later called upon to rule in any aspect of the dispute would apply to resolve the conflict. What is thus significant from this legal flux is not so much which view of law is more accurate, but that from the divergent versions offered, each of which may have aspects of plausibility, it is clear that considerable doubt exists as to whether the liability and other harms Dow Jones fears are in fact sufficiently real and immediate or may not come to pass at all. That contingency, as the Court discusses below, is a vital element of the considerations regarding the appropriateness of the relief sought in this action.

versy" within the meaning of the DJA exists here.

## II. STANDARD OF REVIEW

 The matter now before the Court relates to Harrods' challenge to the Court's subject matter and personal jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2) respectively. Ordinarily, when presented with such a double-barreled jurisdictional attack, the Court should determine the subject matter challenge first.[19] Although this rule does not reflect an "unyielding jurisdictional hierarchy,"[20] and reasons of judicial economy may suggest a different sequence in particular circumstances, the Court finds that in the instant case efficiency is better served by adhering to the customary practice. Accordingly, the Court will address the subject matter issue first.

 Rule 12(b)(1) challenges to subject matter jurisdiction are generally regarded as following two forms. The motion may attack either the facial sufficiency of the pleadings in the complaint or the existence of subject matter jurisdiction in fact, irrespective of the substantive causes of action asserted in the pleadings.[21] In a facial challenge, the court accepts as true the uncontroverted factual allegations in the complaint.[22] By contrast, in connection with a factual challenge the court's review is not confined to the pleadings, but may examine extraneous evidence submitted with the motion and make any findings of fact necessary to determine the existence of subject matter jurisdiction.[23] In that event, the court is not obligated to accord presumptive truthfulness to the allegations of the complaint. Rather, it may weigh the evidence on the record accompanying the Rule 12(b)(1) motion, or hold an evidentiary hearing, and decide for itself the merits of the jurisdictional dispute.[24] Finally, "[t]he burden of proving jurisdiction is on the party asserting it." [25]

Here, the underlying dispute does not entail Dow Jones' affirmative statement of a substantive cause of action. The Court construes Harrods' challenge to constitute an attack on the factual existence of subject matter jurisdiction under the DJA rather than a facial challenge to the sufficiency of the pleadings. Accordingly, the Court will consider the various affidavits and other documents submitted by both sides as these relate to the jurisdictional dispute and make factual findings as necessary to determine whether subject matter jurisdiction does exist.

## III. DISCUSSION

 This case encompasses the bounds, contours, purposes and interstices of the DJA.[26] That statute is an enabling law

---

19. See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 578, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999); see also United States ex rel. Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148, 1155–56 (2d Cir.1993); see generally 2 James Wm. Moore et al., Moore's Federal Practice § 12.30[1], at 12–35–36 (3d ed.1997).

20. Ruhrgas, 526 U.S. at 578, 119 S.Ct. 1563.

21. See Lawrence v. Dunbar, 919 F.2d 1525, 1528–29 (11th Cir.1990) (per curiam) (citing Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir.)), cert. denied, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980) (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549

F.2d 884, 891 (3d Cir.1977)); see generally 2 Moore's Federal Practice, supra, § 12.30[3].

22. See Garcia v. Copenhaver, Bell & Assoc., M.D's P.A., 104 F.3d 1256, 1260–61 (11th Cir.1997) (citing Lawrence, 919 F.2d at 1529); 2 Moore's Federal Practice, supra, § 12.30[4], at 12–38.

23. See Garcia, 104 F.3d at 1260–61.

24. Id.

25. Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir.1994).

26. Section 2201(a) of the DJA provides in pertinent part:

which confers discretionary jurisdiction upon federal courts rather than an absolute right upon the litigant invoking the remedy.[27] Specifically, the statute provides that in a case of an "actual controversy" within its jurisdiction, "[a] federal court *may* declare the rights and other legal relations of any interested party seeking such declaration...." [28]

The DJA remedy was designed as a means to facilitate early and effective adjudication of disputes at a time when a controversy, though actual, may still be incipient, but before it expands into larger conflict. The action generally commences at the instance of a party facing potential liability to another who may have an accrued claim at that time but has not yet commenced coercive litigation to pursue relief. By enabling the parties to narrow the issues and differences and expedite resolution of their conflict, the DJA procedure helps to minimize the prolongation of disputes, reduce the risk of loss and avoid the unnecessary accumulation of damages.[29]

Declaratory relief thus not only functions as an adjudicatory device but serves a preventive purpose as well. It permits the court in one action to define the legal relationships and adjust the attendant rights and obligations at issue between the parties so as to avoid the dispute escalating into additional wrongful conduct. In this manner, the statute can avert greater damages and multiple actions and collateral issues involving not only the original litigants but potentially other third parties. So employed, the remedy promotes several utilitarian values in the adjudication of disputes: speed, economy and effectiveness. The Second Circuit, in *Beacon Const. Co., Inc. v. Matco Elec. Co., Inc.*,[30] has recognized these efficiencies as the primary purposes of the DJA. There, the Circuit Court noted that the statute was intended to "'afford a speedy and inexpensive method of adjudicating legal disputes without invoking the coercive remedies of the old procedure, and to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships.'" [31]

The motion before the Court raises three basic issues that arise from the plain language and stated purposes of the statute, and from a number of guiding principles that govern the applicability of the remedy: whether the action as described in the pleadings (1) raises an "actual controversy"; (2) falls within the scope of cases for which the DJA was intended, and (3) presents circumstances sufficiently compelling to warrant exercise of the

---

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a) (1994).

**27.** See *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241, 73 S.Ct. 236, 97 L.Ed. 291 (1952).

**28.** 28 U.S.C. § 2201(a) (emphasis added).

**29.** *See In re Combustion Equip. Assocs.*, 838 F.2d 35, 37 (2d Cir.1988); *United States v. Doherty*, 786 F.2d 491, 498 (2d Cir.1986); 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2751, at 456–57 (3d ed. 1998) (*"Wright, Miller & Kane"*); 12 James Wm. Moore et al., *Moore's Federal Practice*, § 57.031[2], at 57–11, 57–12 (3d ed.2001).

**30.** 521 F.2d 392 (2d Cir.1975).

**31.** *Id.* at 397 (quoting *Aetna Cas. & Surety Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir.1937)).

Court's discretion to grant or deny the relief requested. These issues are considered in turn.

## A. ACTUAL CONTROVERSY

### 1. Meaning and Scope of Actual Controversy

As a threshold issue, DJA actions are justiciable only in cases in which an "actual controversy" exists.[32] The relevant inquiry for this prerequisite is coextensive with the analysis applicable to the "case or controversy" standard embodied in Article III of the United States Constitution.[33] To this end, the Supreme Court has reinforced that the DJA does not alter the essential predicates for the exercise of federal jurisdiction embodied in the prescription that "'[t]he judicial power does not extend to abstract questions' and that '[c]laims based merely upon 'assumed potential invasions' of rights are not enough to warrant judicial intervention.'"[34] This requirement circumscribes federal jurisdiction to real conflicts so as to preclude the courts from gratuitously rendering advisory opinions with regard to events in dispute that have not matured to a point sufficiently concrete to demand immediate adjudication and thus that may never materialize as actual controversies. Recognizing the practical difficulties associated with fashioning a precise test to distinguish in every case between an abstract, hypothetical or academic question and a real and substantial controversy, the Su-

preme Court has acknowledged that the difference is necessarily a matter of degree. In *Maryland Casualty Co. v. Pacific Coal & Oil Co.*,[35] the Court offered as guidance that

[b]asically, the question in each case is whether the facts alleged, under the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

The Supreme Court has stressed not only that the controversy must be sufficiently real and immediate, allowing specific and conclusive relief, but that it must also be ripe for adjudication. In *Wycoff*, the Court instructed that "[t]he disagreement must not be nebulous or contingent but must have taken a fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on its adversaries, and some useful purpose to be achieved in deciding them."[36] In a similar vein, the Second Circuit, in *Muller v. Olin Mathieson Chem. Corp.*,[37] reaffirmed that the measure of an actual controversy is necessarily relative and demands corresponding flexibility; it instructed that "[t]he difference between definite, concrete and substantial controversies which are justiciable, and hypothetical, abstract, or academic ones which are not justiciable, is one of degree, to be determined on a case by case basis."[38] Accordingly, a touchstone to

---

**32.** 28 U.S.C. § 2201(a).

**33.** See *Wycoff*, 344 U.S. at 241–42, 73 S.Ct. 236; *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–40, 57 S.Ct. 461, 81 L.Ed. 617 (1937); *Keene Corp. v. Fiorelli*, 14 F.3d 726, 731 (2d Cir.1993).

**34.** *Wycoff*, 344 U.S. at 242, 73 S.Ct. 236 (quoting *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 325, 56 S.Ct. 466, 80 L.Ed. 688 (1936)); see also *F.X. Maltz, Ltd. v. Morgenthau*, 556 F.2d 123, 125 (2d Cir.1977);

see generally 10B *Wright, Miller & Kane, supra*, § 2757, at 477.

**35.** 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

**36.** 344 U.S. at 244, 73 S.Ct. 236.

**37.** 404 F.2d 501 (2d Cir.1968).

**38.** *Id.* at 504 (citing *Maryland Casualty*, 312 U.S. at 273, 61 S.Ct. 510).

guide the probe for sufficient immediacy and reality is whether the declaratory relief sought relates to a dispute where the alleged liability has already accrued or the threatened risk occurred, or rather whether the feared legal consequence remains a mere possibility, or even probability of some contingency that may or may not come to pass.[39]

■ The "actual controversy" standard is conceptually linked to the doctrine of ripeness, requiring that the claim of threatened injury be of direct and immediate impact and the injury sufficiently likely to occur, so as to render the issue appropriate for judicial review.[40] In *Laird v. Tatum*,[41] the Supreme Court elaborated on this prerequisite. Reversing a determination that a sufficient controversy existed in an action for declaratory relief, the Court noted that allegations of a "subjective chill" on the exercise of First Amendment rights "are not an adequate substitute for a claim of specific present objective harm or threat of a specific future harm."[42]

### 2. The Actual Controversy Standard Applied

■ In the light of this overview of relevant principles, the Court is not persuaded that under the circumstances presented here Dow Jones has met its burden to sufficiently demonstrate the existence of an actual controversy.

Dow Jones contends the April 5 Article is non-actionable under American First Amendment jurisprudence, and hence that any judgment obtained in the London Action pursuant to foreign libel law principles repugnant to United States constitutional doctrine and public policy would be unenforceable in American courts.[43] Thus, under Dow Jones' theory, an actual controversy exists by reason of the mere potential that Dow Jones may be exposed to liability in the London Action and that its being compelled to defend a lawsuit that would be found meritless in any court in the United States violates Dow Jones' First Amendment rights. On this basis, Dow Jones asks the Court to declare un-

**39.** See *Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (noting that central to the ripeness requirement is that courts should not endeavor to resolve contingencies that may or may not occur as expected or may not happen at all).

**40.** See id.

**41.** 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

**42.** *Id.; see generally* 12 *Moore's Federal Practice, supra,* § 57.22[3][a].

**43.** The court notes that Harrods' motion does not frontally challenge Dow Jones' contentions in this regard. Although in connection with certain Rule 12(b)(1) motions, the Court must consider as true the assertions of fact in the pleadings, here the Court has concluded that Harrods' motion presents an attack on the existence of subject matter jurisdiction irrespective of the facial sufficiency of the pleadings. *See supra* Part II. Accordingly, the Court need not attach a presumption of truthfulness to the pleadings in the complaint. *See Lawrence*, 919 F.2d at 1529. Moreover, with respect to Dow Jones' allegations and arguments concerning the likelihood of the unenforceability in the United States of any judgment of defamation rendered in the London Action, the Court notes that such statements constitute not assertions of fact, but conclusions of law. As such, they are not entitled to unqualified acceptance by the Court in connection with this motion. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir.1994). Nonetheless, because Harrods has not asserted any direct challenge to this aspect of Dow Jones' allegations, for the purposes of this motion, the Court will resolve any doubts on this point in Dow Jones' favor and treat these assertions as uncontroverted. The Court, of course, can make no assumption at this time as to which, if any, of the English defamation law doctrines Dow Jones contends are antithetical to American public policy the British courts are likely to apply in any judgment rendered in the London Action.

enforceable, not only in the United States and the United Kingdom but anywhere else in the world, any libel judgment Harrods may obtain against Dow Jones in the London Action grounded on the April 5 Article. The Court cannot accept Dow Jones' proposition.

Even if Dow Jones' theory that a judgment against it in the London Action would be unenforceable in most or all American jurisdictions were conceded, it does not follow that the mere prospect that such a ruling may be rendered at some indefinite point in the future raises a sufficient actual controversy within the meaning of the DJA. The Court does not find enough immediacy and reality in Dow Jones' claim at this early stage of the London Action to warrant declaratory relief. In essence, Dow Jones' complaint is grounded on a string of apprehensions and conjectures about future possibilities: that the court in the London Action will find a basis to assert jurisdiction and will recognize the pleading of a sufficient claim; that an adverse ruling on the merits may be rendered against Dow Jones; that the adjudication may award Harrods compensatory damages or enjoin Dow Jones from publishing the April 5 Article; that Harrods may seek to enforce such judgment in the United States or elsewhere; that if enforcement is sought, the judgment will be recognized somewhere. At this junc-

ture, however, these protestations and prospects amount to nothing more than what they still are: premature concerns about contingencies that may or may not come to pass.[44]

In fact, Dow Jones cannot assert with any degree of concreteness or certainty at this point that Harrods' claim in the London Action necessarily would prevail on jurisdictional defenses[45] or on the merits under applicable British libel law principles. It cannot identify which particular aspects of the April 5 Article the British court may find defamatory nor which method and timeframe of publication would be held actionable. What specific relief would be granted, whether monetary or injunctive, and whether a ruling against Dow Jones would be sustained on final appeal, are all speculative questions. Whether or not Harrods would attempt to enforce a favorable judgment in the United States or elsewhere is also uncertain.

Dow Jones' own express confidence that any judgment rendered against it in the London Action would be summarily dismissed in any United States court works against its strenuous assertions that it faces a real, sufficiently direct and immediate threat of injury. In this regard, given the current posture of the London Action, the Court finds that Dow Jones' claim of impending harm, and its fears of enforce-

---

**44.** *See Thomas,* 473 U.S. at 580–81, 105 S.Ct. 3325; *Wycoff,* 344 U.S. at 244, 73 S.Ct. 236.

**45.** Dow Jones contends that it does not publish the *Journal* or transact any other business in the United Kingdom, and that whatever activities or contacts it may have there are maintained through a separate subsidiary or affiliate, Dow Jones International. (*See* Transcript of the Oral Argument on September 19, 2002 ("Tr."), at 12.) Whether or not Dow Jones had sufficient presence or contacts or conducted enough business in the United Kingdom directly or through its affiliate to warrant the exercise of personal jurisdiction

by the British tribunals represents a jurisdictional dispute that should be addressed in the first instance in the London Action under an application of governing English law relating *to in personam jurisdiction and relationships* among corporate affiliates. The court there may or may not find a supportable legal basis to assert judicial authority over Dow Jones, an unknown that raises some possibility that *Dow Jones could prevail on this point and* that the liability it fears may never materialize. To this degree, its assertion of a controversy about actual and immediate injury loses much of its reality and immediacy.

ment of an adverse judgment, are too abstract, remote and hypothetical to constitute an actual controversy qualifying for the declaratory relief it seeks.

### 3. *First Amendment Considerations*

██ Dow Jones nonetheless contends that it is entitled to declaratory relief by virtue of the mere act of its having to defend what it considers a frivolous lawsuit in a foreign tribunal. It argues that this burden presents sufficient present harm and chilling effect on its First Amendment rights to constitute a justiciable controversy, and that this constitutional dimension elevates the stakes and should lower the threshold for finding an actual controversy, distinguishing this action from cases involving ordinary commercial disputes. In support of its proposition Dow Jones cites cases in which the Supreme Court has found it appropriate for federal courts to grant declaratory or injunctive relief barring parallel state court proceedings in which fundamental federal constitutional rights are threatened or not adequately protected.[46]

It is true that under some circumstances it is easier to satisfy the threshold of a justiciable controversy when the claim implicates First Amendment rights.[47] However, the precedents Dow Jones' argument relies upon, as the Supreme Court subsequently made clear, do not constitute the rule, but a rigidly narrow exception to settled doctrines. In *Younger v. Harris,*[48] the Court noted:

"[w]e hold that the *Dombrowski* decision should not be regarded as having upset the settled doctrines that have always confined very narrowly the availability of injunctive relief against state criminal prosecutions. We do not think that opinion stands for the proposition that a federal court can properly enjoin enforcement of a statute solely on the basis of a showing that the statute 'on its face' abridges First Amendment rights."

The *Younger* Court recognized that not every chilling effect on freedom of expression presents a justiciable controversy warranting extraordinary equitable relief.[49] It found that no genuine controversy was presented with respect to parties who did not yet face prosecution under a statute alleged to infringe protected speech but who merely claimed that they "feel inhibited" in the exercise of First Amendment rights by reason of a state law.[50] Responding to this concern, the court observed: "[p]ersons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs in such cases." [51]

With respect to the defendant in *Younger* who actually was prosecuted, the Supreme Court found that the prospect of defending a criminal proceeding under a statute regulating speech did not amount to sufficient basis, in and of itself, to support federal injunctive relief barring the state proceeding. The "chilling effect" on freedom of expression associated with such prosecution, the Court noted, "should not

---

**46.** *See, e.g., Zwickler v. Koota,* 389 U.S. 241, 249–251, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); *Dombrowski v. Pfister,* 380 U.S. 479, 489–90, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *see also New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

**47.** *See Golden v. Zwickler,* 394 U.S. 103, 109–110, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *National Student Ass'n v. Hershey,* 412 F.2d 1103, 1113–15 (D.C.Cir.1969).

**48.** 401 U.S. 37, 53, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

**49.** *See id.* at 42, 91 S.Ct. 746.

**50.** *Id.*

**51.** *Id.*

by itself justify federal intervention."[52] Moreover, also germane to the issues Dow Jones' claim raises here, the *Younger* Court stated that: "Certain types of injury, in particular, the cost, anxiety and inconvenience of having to defend a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term."[53] And, as noted above, the Supreme Court also held in *Laird* that allegations of a "subjective chill" on the exercise of First Amendment freedoms are insufficient to create an actual controversy absent a concrete claim of specific *present* "objective" harm or threat of future harm.[54] Under these standards, this Court concludes that Dow Jones' allegations of present or future harm are neither sufficiently concrete, objective or specific to support a finding of an actual controversy justifying the extraordinary relief Dow Jones seeks.

### 4. Intercourt Conflict and Comity

The precedents Dow Jones cites in support of its argument are inapposite in other respects. Those cases allowed federal injunctions of state court proceedings under extraordinary circumstances. But they did so in the context of domestic federal-state principles under which the issuance of relief by a federal court could afford an effective, enforceable remedy. Under the Supremacy Clause and principles of federalism embedded in our constitutional structure, the federal and state systems of government, though separate, are also interconnected and interdependent in vital ways. As the Supreme Court noted in *Wycoff:* "State courts are bound equally with the federal courts by the Federal Constitution and laws."[55] Thus, final federal judgments must be given full faith and credit and conclusive effect in state courts.

The circumstances are quite distinct as regards the foreign proceeding at issue here. Dow Jones insists that a real controversy exists because the relief it seeks would declare preemptively that Harrods' cause of action in the United Kingdom would be nullified not only in the United States but, under the American "single publication rule,"[56] *"anywhere else in the world, including the U.K. itself."*[57] On this basis, Dow Jones asks this Court, in

**52.** *Id.* at 50.

**53.** *Id.* at 46; *see also Nat'l Student Ass'n,* 412 F.2d at 1113–1114 ("[W]e are not persuaded that every plaintiff who alleges a First Amendment chilling effect and shivers in court has thereby established a case or controversy.").

**54.** 408 U.S. at 13–14, 92 S.Ct. 2318.

**55.** 344 U.S. at 247–48, 73 S.Ct. 236.

**56.** According to Dow Jones, a plaintiff in the United Kingdom may sue a defendant for each individual "publication" of an allegedly defamatory statement. In other words, separate actions may be cognizable for print publication as opposed to Internet publication, as well as in every particular country where the publication occurred and plaintiff suffered damages. By contrast, in the United States, the single publication rule, recognized by "the great majority" of states, limits defamation actions by requiring that for any single publication: (1) only one action for damages can lie; (2) all damages suffered in all jurisdictions may be recovered in the same action; and (3) a judgment on the merits of plaintiff's claims bars similar suits between the same parties in all jurisdictions. (*See* Stephens Decl. ¶ 5(k), at 4; and Pl.'s Memo at 10–11.) (citing *Restatement (Second) of Torts* § 577 A and *Keeton v. Hustler, Magazine, Inc.,* 465 U.S. 770, 777, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). Harrods takes issue with Dow Jones' view of English law on this point, contending that Dow Jones' characterization does not represent the reality of English law, and that it would be an abuse of process for a plaintiff to bring more than one defamation action against the same defendant in England based on the same publication. (*See* Price Decl. ¶¶ 17, 20, at 10, 11.)

**57.** Pl.'s Memo at 13 (emphasis in original).

aid of declaratory relief, to enjoin Harrods from pursuing its litigation in the London Action and every other possible forum. The Court cannot endorse such a far-reaching request. The constitutional strictures of the Full Faith and Credit Clause do not extend to international assertions of jurisdiction, especially those that the forum state may consider extravagant or exorbitant.[58]

American law contains among the most extensive mantle of rights and safeguards to guarantee and protect individual freedoms and fundamental fairness. Gauged by the rigorous standards constituting the American conception of civil liberties and due process, the legal systems of many foreign states are bound to fall short as to any given basic precept our law encompasses. Accordingly, countless occasions inevitably arise when Americans are sued in foreign tribunals by parties invoking laws that in some aspect or other may not measure up to our constitutional mark or may even do violence to public policies and principles Americans hold dear—not only those valued under the First Amendment, but under other vital protections of our jurisprudence.

Dow Jones maintains that in the contemporary world, the Internet has made communications originating in the United States instantly available almost anywhere on Earth and, consequently, has rendered publishers vulnerable to the application of foreign laws regulating speech and to potential liability incompatible with American First Amendment principles. At the cusp of this momentous development, Dow Jones urges, United States courts in general, and this Court in particular, are thus uniquely poised to seize the opportunity to reinforce and enlarge the First Amendment protections American publishers enjoy so as to bar preemptively potential liability for any alleged defamation injury their commercial activities conducted in this country and transmitted through the worldwide web may cause in foreign jurisdictions. Validating this proposition would make it appropriate and commonplace for litigants to resort to federal courts under the DJA to obtain declarations of non-liability and injunctive relief whenever a party alleges that it faces even a mere prospect of a lawsuit or contingent liability in a foreign jurisdiction whose laws or procedures may conflict in some way with fundamental rights enjoyed under United States law.

Thus, under Dow Jones' hypothesis, the DJA would confer upon an American court a preemptive style of global jurisdiction branching worldwide and able to strike down offending litigation anywhere on Earth. Intriguing as such universal power might appear to any judge, this Court must take a more modest view of the limits of its jurisdiction, and offers a more humble response to the invitation and temptation to overreach. The Court finds nothing in the United States Constitution, nor in the DJA or in customary practice of international law, that comports with such a robust, Olympian perspective of federal judicial power.

Dow Jones itself implicitly acknowledges a first manifest flaw in its argument. It contends that the judgment it seeks from this Court would have a direct impact and immediately end the London Action "[i ]f

---

**58.** *See Restatement (Third) of the Foreign Relations Law of the United States: Jurisdiction to Adjudicate* § 421(2)(i), at 304–05 (1987) (*"Restatement (Third) of Foreign Relations"); see also id.* at § 431 and Comment at 321–22 (noting that under international law, a state may not exercise authority to enforce a law that it has no jurisdiction to prescribe, whether the assertion of jurisdiction is carried out through the courts or by nonjudicial means); *see generally* Albert A. Ehrenzweig, *A Treatise on the Conflict of Laws,* §§ 51, 59, at 52 (1962).

**412**

*recognized by the British court,"* an eventuality Dow Jones suggests "likely would" happen.[59] Dow Jones cites no authority for its bold proposition, other than the conclusory assertion of its London counsel. The statement is not only speculative, but strenuously contested by Harrods' own solicitor, who questioned "on what basis it could possibly be said that an English court would recognize and apply a decision by an American Court as to whether a publication in England was actionable in accordance with English law,"[60] and expressed doubt "that the English court would be greatly influenced by the fact that the defendant had sought declaratory relief, presumably on the basis of the American law of defamation, in New York."[61] In light of such divergent expressions of legal opinion on foreign law by advocates for the two parties, neither thoroughly briefed, the Court is not in a position to accept as uncontroverted fact Dow Jones' hypothesis that the British tribunals would unquestioningly recognize a declaratory ruling of this Court as dispositive of the matters at issue in the London Action. The Court need not resolve definitively which version of English rules governing this point more closely reflects applicable law, although it better comports with this Court's notion of common sense and the practicalities of judicial administration to find Dow Jones' theory highly improbable.

Moreover, the large contingency reflected by that prominent "IF" would apply in every other corner of the globe where Harrods might alternatively choose to litigate the events at issue in the London Action or enforce an ensuing judgment. The argument presupposes an equally doubtful premise: that every other plausible sovereign jurisdiction in this world would similarly recognize the wisdom and commendable respect that the British tribunal would exhibit if it were to honor the higher authority of American law that this Court would have proclaimed dispositive and binding, and, in an equally pliant and agreeable display of deference, likewise would bow to this Court's presumed superior judgment.[62]

The Court cannot share Dow Jones' ebullient faith in this prospect. Just as the Court's professed perception of its authority to grant the relief sought here is more restrained than the vision Dow Jones' theory tenders, the Court also harbors a skeptical view of the international recognition that would be accorded to a preemptive declaration by this Court to the effect that, because under American law a person could not be sued for a particular libel published in the United States, that party therefore could not be sued anywhere else in the world under the laws of any other country where the libel was actually published and plausibly may

---

59. Pl.'s Memo at 14, 16.

60. Price Decl. ¶ 20, at 11.

61. *Id.* ¶ 21, at 11.

62. Parody, if the tone of this portrayal may so appear, is not the message the Court's *"tongue-in-cheek hyperbole" intends on this* point. (Deinard Decl. Ex. A.) Nor is it derision. Rather, any levity here conveyed is but a medium, and like the desired effect of any parable, metaphor or fable, what the Court *strives to capture is that of teachings in-*

formed by the art of purposed overstatement and contrast. Just as it is often said about various forms of combat that the best defense is a good offense, so at times in dialectics the best instruction may come by deconstruction. In this spirit, the Court is mindful that in the quest for wisdom there may be no more sober way to see the fallacy in some human perspectives, and thereby deflate grandiose proportions to real world scale, than by objectively endeavoring to see things as others might perceive them, and to project foreseeable consequences of our acts as others would likely experience them and so respond.

have caused harm. In this Court's reckoning, the realities and practicalities endemic to international relations do not allow for placing much stock in Dow Jones' sanguinity on this point. Any forecast of political or social consequences or even of legal expectations concerning issues on a global scale is bound to be subject to countless variables and imponderables whose vagaries render such oracles suspect and not sufficiently meaningful as grounds for hard judgments.

In fact, Dow Jones' hypothesis finds no support in international law principles or practice. As one leading commentator observed: "Courts of foreign countries, while likely to use comity language, will be reluctant to give effect to any injunctions purporting to restrain their own citizens and transactions."[63] Nor is Dow Jones' proposition likely to gain a sympathetic ear in the United Kingdom to compel a stay of the London Action in favor of the instant proceeding in this Court. Under British practice, where a plaintiff in England is the defendant in a foreign action involving the same parties and events, the courts are reluctant to stay the English proceedings.[64] " 'The court ought not to stay a plaintiff in the courts of this country on the ground that he happens to be a defendant elsewhere.' "[65] Even were this Court to grant the relief Dow Jones seeks, its judgment may not be entitled to recognition or enforcement in the United Kingdom to the extent the British courts may find it contrary to English public policy,[66] or to constitute an effort to prevent the administration of justice for an unjust end.[67]

### 5. Other Case Law

Other authorities Dow Jones cites for its expansive proposition are not on point. In *Yahoo!, Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme,*[68] plaintiff Yahoo! sought a judgment declaring unenforceable in the United States a ruling that defendant, a French entity, had obtained from a tribunal in France. The French order directed Yahoo! not to post for sale through its online auction network accessible in France any items of Nazi memorabilia. The district court rejected defendant's argument. It held that there was no case or controversy because the French tribunal's order was still provisional and subject to appeal prior to any enforcement in the United States.[69] The *Yahoo!* facts are easily distinguishable from those at issue here.

First, the French proceeding was not an incipient lawsuit, or litigation still in its early stages, or merely a feared result that might arise from the prosecution of such a case. Rather, the declaratory action there challenged, after the fact, one consequence of an adjudication that had already been reduced to an actual official order issued by a government tribunal. Thus, the particular conduct which that judgment did or did not encompass, what the foreign tribunal ordered or did not order Yahoo! to do, as well as the specific penalties and time-

---

63. Ehrenzweig, *Conflict of Laws, supra,* § 51, at 183 (citing *British Nylon Spinners, Ltd. v. Imperial Chem. Indus., Ltd.,* [1951] 1 Ch. 37 (1955) (denying recognition to an injunction issued by a United States district court against a British national)).

64. *See* A.V. Dicey and J.H.C. Morris, *The Conflict of Laws,* ch. 33, Rule 183, at 1083 (J.H.C. Morris *et al.* eds., 8th ed. 1967) (*"Dicey's Conflict of Laws"*).

65. *Id.* (quoting *The Janera* [1928] P. 55, 57).

66. *Id.* ch. 31, Rule 159, at 966–68. *Cf. Restatement (Third) of Foreign Relations, supra,* § 482(d), at 604.

67. *See Dicey's Conflict of Laws, supra,* ch. 33, Rule 183, at 1081.

68. 169 F.Supp.2d 1181 (N.D.Cal.2001).

69. *Id.* at 1188.

frame for compliance it imposed, were all substantial, real and immediate. The effects of the French order were concrete and known to Yahoo!. In fact, Yahoo! had sought to comply with it, and the defendant had acknowledged Yahoo!'s substantial compliance, but had not taken steps to withdraw the action.

Second, the French order explicitly extended to an American national's activities in the United States. Compliance with the order required Yahoo! immediately to modify its business operations and the content of its expression in the United States. Third, the order specifically directed enforcement in the United States. Defendants twice used the United States Marshal's office to serve the French order on Yahoo! in California. And the French court prescribed that the penalties assessed against Yahoo! could not be collected from Yahoo!'s affiliate in France.

Finally, the federal declaratory relief Yahoo! sought was limited to a determination that the French order would not be cognizable under the laws of the United States nor enforceable in this country. There was no indication that Yahoo! sought the federal court to bar the French court from prosecuting the action in France or from enforcing its order within any French jurisdiction. Nor was there an implicit argument that because Yahoo's conduct was not actionable in the United States under American law, it could not be actionable at all either in France under French law, or anywhere else. In fact, the *Yahoo!* court underscored that these issues were not before it. Recognizing France's sovereign prerogatives to govern affairs within its borders, the Court stated: "A basic function of a sovereign state is to determine what forms of speech and con-

duct are acceptable within its borders." [70] Thus, the practical and enforceable remedy sought in *Yahoo!* did not implicate judicial ambitions nor arguably extra-judicial forays and intrusions into international affairs. Nor did it place in contention the constitutional dimensions, or the worldwide ramifications for which the DJA is invoked here.

*Farrell Lines Inc. v. Columbus Cello–Poly Corp.* [71] is equally unavailing. Dow Jones cites that case as precedent for the proposition that in aid of declaratory relief a federal court may enjoin parties from pursuing or maintaining litigation in a foreign country. In *Farrell*, the litigants were parties to a commercial shipping transaction reflected in a maritime contract which contained a forum selection clause providing for United States law to govern its construction and designating New York as the venue to adjudicate any claims arising under the agreement.[72] Plaintiff was the owner and operator of the ship and defendants the insurers of cargo damaged at sea. The goods at issue were being shipped to a recipient in the United States in a vessel owned by a United States corporation and registered in the United States, and the accident occurred in the United States. Plaintiff's declaratory judgment action sought no more than to give effect to the parties' contractual commitments under the bill of lading's limitation of liability, venue and choice of law provisions. The defendants, however, subsequently brought suit in Italy claiming that the Italian limitation of liability and forum selection rules applied.

The court found that defendants' challenge to the applicability of the bill of lading's restrictions established the exis-

---

**70.** *Id.* at 1186.

**71.** 32 F.Supp.2d 118 (S.D.N.Y.1997), *aff'd,* 161 F.3d 115 (2d Cir.1998).

**72.** *Id.* at 124.

tence of an actual controversy. Reaching the merits, the court concluded that under federal admiralty and choice of law rules, the enforceability of the forum selection clause would be determined by United States law in accordance with the parties' designation. Accordingly, the federal limitation of liability and forum selection governed, rendering defendants' proceeding in Italy impermissible. The Court concluded that injunctive relief was warranted because defendants' competing litigation in Italy was specifically intended to evade the jurisdiction of the federal court, avoid application of the contractual provisions the parties had agreed upon, and thus frustrate important public policies of the forum.

The *Farrell* court's judgment was fully dispositive of the controversy because it declared the relations between the parties, and their attendant rights and liabilities, applying the substantive law of the forum designated in the bill of lading. Given the contractual basis of the dispute, the conflict was immediate and real and readily determinable through declaratory relief by reference to an agreement circumscribing the legal parameters of the controversy. There was no dispute that an accident had occurred, nor that the cargo was damaged and liability existed. The United States limitation of liability either did or did not apply; the forum selection clause was or was not enforceable; defendants' litigation in Italy was or was not inconsistent with the parties' business arrangement. The litigation in the two separate forums was essentially the same and subject to effective resolution by a federal court vested with proper jurisdiction. No settled expectations of the litigants could have been disturbed by the declaratory and injunctive relief granted by the federal court.

The *Farrell* controversy is thus also easily distinguishable from the matter at hand. Unlike the instant case, it did not raise the delicate issue concerning potential assertions of competing adjudicatory power, nor the scope of a cause of action whose defining elements were grounded on the substantive law of a foreign nation. Clearly, effectuating an agreement containing a forum selection provision to resolve a maritime dispute cannot be equated with the far more intricate and expansive relief Dow Jones seeks in this Court, a remedy that by Dow Jones' own argument presents constitutional and international comity implications not at issue in *Farrell's* ordinary admiralty contract dispute.

The governing law there was predetermined by the parties, and its application readily adjudicated the controversy. By contrast, there is no touchstone by which this Court can dispositively rule that American law should be applied in the case at hand to resolve a conflict pending in a British court involving a claim allegedly arising in the United Kingdom under English law. The *Farrell* court also was not called upon to extend the reach of its authority extraterritorially—as this Court is urged to do—with the desired relief being motivated by substantive choice of law reasons, so as to preclude consideration by a foreign court of an action brought by a national of the foreign country that effectively would have barred application of that nation's own laws to a dispute properly before its courts. In sum, the *Farrell* court was merely called upon to give expression to the contractual intent of the parties to a controversy properly within its jurisdiction, and not to prejudge the outcome of a foreign proceeding by means of a normative conjecture about the quality of justice that a judicial tribunal of another country, if not restrained by the intervention of an American court, would likely render, and by these means compelling the rescue of a domestic litigant from a conjured travesty of law.

More compelling and germane to the action before this Court are the cases in which federal courts considered the appropriateness of granting declaratory relief and found no actual controversies in a context implicating international comity issues more analogous to those entailed here.

In this regard, *Basic v. Fitzroy Eng'g, Ltd.*[73] is closer on point. There, plaintiff ("Basic") and his company ("BEE") entered into an agreement with defendant ("Fitzroy") for BEE to perform design and engineering services for Fitzroy in connection with the installation of a generator in New Zealand. A contract dispute arose which Fitzroy, pursuant to the agreement, took to arbitration. BEE failed to appear in the proceeding and the arbitrator entered a default order against it. Fitzroy then filed an action in New Zealand against Basic alleging that Basic had made negligent misrepresentations that had induced Fitzroy to contract with BEE and Basic.

Basic entered a limited appearance in the New Zealand action to challenge the court's personal jurisdiction and the appropriateness of venue. While the New Zealand action was pending, Basic filed suit in federal court in Illinois seeking declaratory judgment. The complaint asserted various grounds for relief, including that: (1) the New Zealand action was barred by issue and claim preclusion, (2) Fitzroy's claims for negligent misrepresentation were not cognizable under Illinois law, and (3) the New Zealand action was inconsistent with American public policy.[74]

In a motion to dismiss the complaint, Fitzroy argued that the court lacked subject matter jurisdiction to grant the type of declaratory relief Basic sought. The *Basic* court agreed. It found no "actual controversy" in Basic's claim that a judgment in favor of Fitzroy in the New Zealand action would be unenforceable in the United States.[75] Elaborating on this point the court noted:

> Basic seeks to have the court declare a future foreign judgment invalid and unenforceable even before Fitzroy has the opportunity to have the future judgment entered by the New Zealand court and confirmed in a United States federal court. Put another way, Basic's act of filing the instant Complaint is an attempt to render null and void a possible future New Zealand judgment, a judgment which "may never come to pass."[76]

The district court found Basic's request improper and denied declaratory relief for several reasons. The New Zealand action was at a relatively early stage, awaiting an appellate ruling on Basic's jurisdictional challenge. On this basis, a federal court's ruling on the prospective effect of a New Zealand ruling would be premature. Second, the court could only surmise as to the claims which would be sustained by any judgment in the New Zealand action, because in any litigation such claims are always subject to change. Third, the court concluded that granting the relief Basic requested would not serve the purpose of the DJA, in that the declarations sought would not "help him avoid imminent harm" prior to an impending injury-causing event.[77]

Finally, addressing Basic's contentions that judgment in the New Zealand action would be inconsistent with Illinois law and

---

**73.** 949 F.Supp. 1333 (N.D.Ill.1996).

**74.** *See id.* at 1335.

**75.** *Id.* at 1337.

**76.** *Id.* (quoting *American Fidelity & Cas. Co. v. Pennsylvania Threshermen & Farmers' Mut. Cas. Inc. Co.*, 280 F.2d 453, 461 (5th Cir. 1960)).

**77.** *Id.* at 1338.

unenforceable as contrary to American public policy, the court concluded that even if it made such findings, the declarations would be "worthless." [78] In this regard the court stated:

> The action brought by Fitzroy asserts violation of New Zealand law, and findings by this court favorable to Basic would, for obvious reasons, result in neither persuasive nor binding authority on the New Zealand court. The only effect of such declarations would be on Fitzroy's ability to enforce the foreign judgment in the United States. Yet, such a determination by this court at this juncture would be premature. Assuming that Fitzroy prevails on the [New Zealand] action, Basic will have the opportunity to argue the same issues raised in this Complaint to the federal district judge to which any enforcement proceeding is assigned.[79]

Here, viewing as a whole the allegations in the complaint and the contentions Dow Jones raises in connection with the instant motion, it appears that what Dow Jones has erected as its case for the existence of an actual controversy justifying declaratory relief is merely guesswork, an abstract tower of hypotheticals stacked like a house of cards on suppositions piled on top of speculations all founded on conjectures and contingent "ifs", "mays" and "to the extents."

"If" the London Action is not enjoined, the argument goes, Dow Jones may be sued not only in the United Kingdom but in any other country where the offending publication appeared; if so, Dow Jones necessarily will be held liable; if so, Dow Jones may be ordered to pay damages and/or it may be directed to cease future

publication of the article "to the extent that the U.K. court were to issue an injunction" so ordering; [80] Harrods may seek to enforce any judgment not just in the United States but conceivably in other countries. And, as already mentioned, as the antidote to these hypotheticals, if this Court were to grant the relief Dow Jones seeks, the conflict may be fully resolved, closing the loop of surmises, but only "if" the courts in the United Kingdom (and presumably elsewhere) were to recognize and enforce this Court's judgment.

As the *Basic* court found under comparable circumstances, such future contingencies ordinarily do not constitute a proper basis for declaratory relief: "The Constitution does not allow a federal district court to issue advisory opinions based on fears of future judgments and speculation." [81] On this basis, and other considerations discussed above, the Court concludes that Dow Jones' claim does not present a actual controversy warranting the declaratory and injunctive relief it seeks.

With regard to Al Fayed, Dow Jones acknowledges that he has not asserted or threatened any claim against Dow Jones, nor is he a party to the London Action. Dow Jones nonetheless contends that, by reason of Al Fayed's role as chairman and owner of Harrods, and Harrods' "propensity ... to mingle its corporate purposes with promotion of Mr. Fayed's personal interests," while he has "not yet" sued, Dow Jones has no assurance that Al Fayed would not do so, and "believes that Mr. Fayed *may* in fact sue Dow Jones in the future." [82]

The Court finds these unsubstantiated contingent fears insufficient to support a

---

78. *Id.*

79. *Id.*

80. Pl.'s Memo at 18.

81. 949 F.Supp. at 1338.

82. Pl.'s Memo at 12–13 n. 12 (emphasis added).

finding of an actual controversy warranting the requested declaratory judgment against Al Fayed.

## B. *PURPOSES OF THE DJA*

Dow Jones endeavors to shore up the loose sands of contingencies grounding much of its request for declaratory relief by adding a measure of concreteness in real damages it claims to be actually suffering on account of the London Action. It contends that a declaratory judgment would relieve it from "vexatious and oppressive" litigation in another country, in that: (1) the London Action cannot result in any substantial recovery either in the United Kingdom, where Dow Jones maintains no substantial assets, or in the United States, where no court would enforce a judgment based on the April 5 Article; (2) the expense of defending the London Action would be considerable; (3) Dow Jones journalists would be diverted from their news reporting tasks if required to participate in defending the London Action; and (4) the pendency of the London Action causes Dow Jones to be uncertain and insecure in the exercise of its right to continue publishing the April 5 Article.[83] These types of damages, Dow Jones maintains, are real and immediate and infringe on its "constitutional right not be forced to defend harassing litigation in a distant forum."[84]

Thus, bared of the hypotheticals and apprehensions about wrongs and injuries that may or may not occur, what Dow Jones asks this Court to do, in general terms distills to this: to apply the DJA as a defensive shield, a preemptive means to immunize a litigant from the inevitable costs and inconveniences attendant to any form of potential litigation arising from the party's alleged wrongful acts. In essence then, the question the Court must answer is whether the DJA was meant to serve this sanctuarial purpose, and whether it makes a difference that the asserted harmful conduct relates to exercise of First Amendment rights, in this case a protected publication. The Court finds nothing in the statute or in pertinent case law that lends cogency or force to such an application of the DJA.

### 1. *Constitutional Dimensions*

A predicate of Dow Jones' theory is that as regards a claim by a publisher alleging infringement of its freedom of expression by reason of a lawsuit against it arising out of a publication, the First Amendment may be invoked as a refuge to guard against the various burdens and effects ordinarily associated with litigation, whether foreign or domestic. There is no merit to such a far-reaching proposition. First, as already discussed above, the Supreme Court has declared that even in the much more profoundly harmful context of a criminal prosecution instituted under a tenuous statute regulating speech, alleged injuries such as the cost, anxiety and inconveniences an individual may suffer by being compelled to defend litigation are not sufficient by themselves to be considered irreparable, and thus to justify extraordinary federal injunctive relief to bar state judicial proceedings.[85] The Second Circuit has also rejected as insufficient grounds for relief a publisher's conclusory and speculative assertions claiming a chilling effect on First Amendment rights when based merely on its having to defend an allegedly unmeritorious lawsuit.[86]

---

83. Compl. ¶ 72.

84. Pl.'s Memo at 19.

85. *See Younger,* 401 U.S. at 46, 91 S.Ct. 746; *see also Laird,* 408 U.S. at 13–14, 92 S.Ct. 2318.

86. *See Spear,* 954 F.2d at 67–68.

Second, however subjectively vexatious or oppressive defending a lawsuit may be deemed, even by a publisher, an asserted "right not to be forced to defend harassing litigation in a distant forum" [87] must be balanced against the no less weighty and fundamental due process right of every person in our society to fair access to the judicial system in order to have his day in court.[88]

As the claim is articulated here, the Court fails to see how it matters that the forum in which the action Dow Jones objects to is far away or near. Dow Jones' invocation of its purported right to be protected from litigation "in a distant forum" could not be distinguished from the defense of litigation on the part of many publishers, no doubt including Dow Jones, routinely sued on any given day all over the country on claims the defendants may regard no less frivolous, harassing or oppressive than those Dow Jones faces here. It could not be unusual to a publisher in one part of the country to be subjected to a lawsuit instituted in distant jurisdictions, even when it may consider the action entirely unmeritorious under established First Amendment principles. The potential costs, diversion of personnel and resources, the effects of an adverse ruling and other inconveniences associated with defending such litigation would be no less burdensome than those Dow Jones complains of in the instant case. To address legitimate concerns about potential incon-venience to the parties, appropriateness of venue or source of substantive law, aggrieved litigants may avail themselves of established procedures and remedies such as the doctrine of *forum non conveniens* and principles of judicial abstention or comity.[89] But the response to these potential burdens is not as a routine matter to preemptively shut access to the courthouse in one forum by an anticipatory restraining order issued in another jurisdiction.

Neither is it persuasive that the law governing the allegedly burdensome litigation is claimed to offend fundamental federal rights, or that it is foreign rather domestic law. It should come as no surprise to a publisher doing business in many jurisdictions to be hauled into a state court anywhere in this country to defend an action brought under a then prevailing theory of state law whose concept or application of the First Amendment may not conform in some particular way with the understanding the publisher advocates. That a litigant quarrels with a given substantive state law and asserts that on its face a domestic libel suit based on it should be summarily dismissed as hostile to the First Amendment and that any judgment rendered pursuant to it would be patently unenforceable, does not by itself render that affirmative defense eligible for recognition in federal court as a barrier to alleged potentially costly, burdensome or even "chilling" litigation in a state forum.[90] Again, this principle is the same when the application of law is that of a foreign country.[91]

---

87. Pl.'s Memo at 19.

88. *See, e.g., Brinkerhoff–Faris Trust & Sav. Co. v. Hill,* 281 U.S. 673, 678, 50 S.Ct. 451, 74 L.Ed. 1107 (1930); *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314–15, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

89. *See, e.g., Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 928 (D.C.Cir.1984) (citing *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 258–61, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)).

90. *See Younger,* 401 U.S. at 46, 91 S.Ct. 746; *Spear,* 954 F.2d at 67–68.

91. *See generally Sabena,* 731 F.2d at 928–29 ("important principles of comity . . . compel deference and mutual respect for concurrent foreign proceedings.").

Yet, under the logical extension of Dow Jones' theory, a publisher would be entitled as a matter of course to invoke the DJA as protection and relief from any subjectively irksome and self-declared frivolous litigation affecting freedom of expression, implicitly investing the DJA with operation as a source of substantive rights—a purpose for which the statute was not envisioned.[92]

### 2. Antisuit Injunctions

To be sure, the Supreme Court has left open the possibility that a strong demonstration of bad faith or harassment sufficiently unusual or unconscionable could justify federal intervention to protect the exercise of First Amendment rights against a particular potential infringement in a state proceeding.[93] It made clear, however, that such interference could be justified only in very narrow, "extraordinary circumstances."[94] The conditions under which this rigorous standard may be satisfied are rare and strictly confined: where an injunctive remedy is necessary in aid of the court's jurisdiction or to protect or effectuate its judgments.[95] These circumstances ordinarily arise post-judgment in cases where a party, by filing a separate action in another forum, seeks to relitigate matters already adjudicated, or pre-judgment where the litigant otherwise acts unconscionably or in bad faith to frustrate the exercise of the first court's proper jurisdiction in order to circumvent domestic laws.[96]

What public policies these rules encompass, and to what extent domestic law may be vitiated by a foreign proceeding before comity is not entitled to recognition and injunctive relief may be justified, is not clearly defined. Comity would not be warranted, however, where the purpose of the foreign interference is specifically designed to impede the forum court's exercise of its proper jurisdiction and thereby hinder its ability to adjudicate a particular conflict pending before it.[97] Under these circumstances denial of comity may be justifiable not necessarily on account of the repugnance of the foreign jurisdiction's justice system whose protection a litigant has invoked, but by reason of the apparent purposeful evasion of the forum's public policies and judicial power.[98]

Here, Dow Jones has not made a persuasive case that Harrods' mere filing of the London Action represents sufficient extraordinary circumstances demonstrating unconscionable bad faith or harassment.

The case at hand is not one in which objectively unusual vexatiousness or bad faith is clearly evidenced by absence of any legitimate basis for Harrods to be litigating in the British courts for no reason other than as a tactic calculated to evade

---

**92.** See Wycoff, 344 U.S. at 242–243, 73 S.Ct. 236.

**93.** See Younger, 401 U.S. at 53–54, 91 S.Ct. 746.

**94.** Id.

**95.** See, e.g., 28 U.S.C. 33 § 2283; China Trade and Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 36–37 (2d Cir.1987); Sabena, 731 F.2d at 928–29 n. 59; see generally 17 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure §§ 4225 at 534–35, 4226 at 548–49 (2d ed.1988) (noting that the exceptions provided by 28 U.S.C. § 2283 do not authorize federal courts to enjoin state court proceedings merely to protect a judgment that involves issues presented in a federal in personam action, or to protect a judgment "that the federal court may make in the future but has not yet made."); see also infra notes 106–110 and accompanying text.

**96.** See, e.g., China Trade, 837 F.2d at 36–37; Sabena, 731 F.2d at 928–29.

**97.** See Sabena, 731 F.2d at 929.

**98.** See id. at 931 n. 71.

compliance with domestic law or frustrate important public policy.[99] To the contrary, Harrods' defamation claim in the London Action relates only to injury alleged by a British national to have arisen by publication of the April 5 Article in the United Kingdom and the action is being pursued there under British law.[100] Dow Jones acknowledges that it has affiliates that publish European print editions of the *Journal*, that it holds some (though allegedly not substantial) assets in the United Kingdom, where it presumably maintains some presence or conducts business activities in London, and that the April 5 Article was accessible online to paid subscribers of WSJ.com, some of whom are probably situated in Britain.[101]

On the facts before it, there is no basis for the Court to find that Harrods' claims could not state a cognizable cause of action under British law, or that the British courts have no legitimate grounds pursuant to their applicable rules and procedures to assert jurisdiction over the dispute so as to decide whether or not Harrods' pleadings state a sufficient defamation claim.[102]

### 3. *Concurrent Jurisdiction*

#### a. *Jurisdictional Basis*

■ The Court already determined above that this action warrants dismissal because no actual controversy exists in the current posture of the case. However, even assuming for the purposes of this argument that some element of Dow Jones' claims did present an actual controversy under American law, the end result may not differ. In that event, at best the case may be viewed as presenting an instance of the Court's concurrent jurisdiction to adjudicate, and the proper approach to a resolution of the dispute would apply the corresponding jurisdictional analysis. On this hypothesis, the fundamental public policy and laws of two sovereign states governing defamation conceivably may apply to regulate some aspects of the same publication and to confer authority upon their respective courts to adjudicate the underlying controversy. Any intercourt dispute that may arise in that event may be addressed by traditional conflict of laws principles and choice of forum analysis applicable to divergent assertions of judicial power.

■ The state's exercise of jurisdiction to adjudicate, as an adjunct of the power to prescribe governing law, generally derives from the relationship of the state to the particular person or thing that is the subject of the litigation, including the defendant's presence, conduct, or ownership of property within the state, or conduct occurring outside the state's territorial boundaries but producing certain kinds of injury within the state.[103] Based on these predicates, the United Kingdom may have legitimate national interests and a valid jurisdictional basis to exercise jurisdiction to protect its residents from the harmful effects of an alleged defamation action arising within its boundaries. At the same

---

**99.** *See Harvey Aluminum, Inc. v. Am. Cyanamid Co.*, 203 F.2d 105, 108 (2d Cir.1953).

**100.** *See* Price Decl. ¶ 19.

**101.** Dow Jones estimates that it has between 5,000 and 6,000 paid subscribers of WSJ.com in the United Kingdom. *See* Tr. at 11.

**102.** *See supra* notes 95–98 and accompanying text.

**103.** *See, e.g., International Shoe Co. v. Washington*, 326 U.S. 310, 317–19, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Hanson v. Denckla*, 357 U.S. 235, 251, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Shaffer v. Heitner*, 433 U.S. 186, 212, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); *see generally Restatement (Third) of Foreign Relations, supra*, § 421(2)(j) at 304–05 § 421.

time, the United States has a profound interest in fostering its broad concept of First Amendment freedoms, and safeguarding the freest exercise of those fundamental rights within the United States by all persons accorded the protection of American law.

 In cases where national jurisdiction overlaps and an apparent conflict over competing assertions of judicial authority exists, the Court must examine the sufficiency of the respective jurisdictional contacts and interests to ascertain whether either claim is unsubstantiated, or whether guiding principles apply that on balance compel a particular method to resolve the tension.[104] The Court could exercise discretion to intervene in the parties' proceeding with the London Action, and would be under no obligation to defer to the British tribunal, for example, if it found that in fact there was no clear justification for the exercise of adjudicatory power by the United Kingdom over the matter because its assertion of jurisdiction is extravagant, and that allowing the parties to pursue the foreign litigation would violate fundamental interests of the United States.[105]

### b. *Basis for Injunctive Relief*

 But even when concurrent jurisdiction to adjudicate does exist, that circumstance by itself does not produce conflict, nor is it sufficient to justify one forum's exercise of judicial power to interfere with or restrain parallel proceedings in another.[106] Federal courts do have power to exercise control over the conduct of parties within their jurisdiction extending to restraining them from pursuing litigation in foreign tribunals.[107] Under settled doctrine, however, the authority of federal courts to enjoin foreign lawsuits involving litigants within their jurisdiction, where it is appropriate, should be used sparingly and granted only with care and restraint.[108] As the Second Circuit has cautioned: "[B]ecause an order enjoining a litigant from continuing a foreign action is facially obstructive, international comity demands that this extraordinary remedy be used only after other means of redressing the injury sought to be avoided have been explored."[109]

 To guide the courts in applying these restrictive standards, the Second Circuit has recognized an approach entailing several considerations. First, the court must determine as a threshold matter that (1) the parties in both matters are the same, and (2) resolution of the case before the enjoining court must be dispositive of the action to be restrained. Upon finding these requirements, a court should then consider other relevant factors: (1) frustration of a policy in the enjoining forum; (2) vexatiousness of the foreign

---

104. *See Sabena,* 731 F.2d at 922.

105. *Id.* at 921.

106. *Id.; Computer Assocs.,* 126 F.3d at 371–72; *China Trade,* 837 F.2d at 36 (citing *Donovan v. City of Dallas,* 377 U.S. 408, 412, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964)); *Compagnie des Bauxites de Guinea v. Ins. Co. of No. Am.,* 651 F.2d 877, 887 (3d Cir.1981), *aff'd on other grounds,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); *see also Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs,* 398 U.S. 281, 295, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970).

107. *See, e.g., Cole v. Cunningham,* 133 U.S. 107, 10 S.Ct. 269, 33 L.Ed. 538 (1890); *United States v. Davis,* 767 F.2d 1025, 1038 (2d Cir.1985); *In re Marc Rich & Co., A.G.,* 707 F.2d 663, 666 (2d Cir.), *cert. denied,* 463 U.S. 1215, 103 S.Ct. 3555, 77 L.Ed.2d 1400 (1983); *Sabena,* 731 F.2d at 926; *Canadian Filters (Harwich) v. Lear–Siegler,* 412 F.2d 577, 578 (1st Cir.1969).

108. *See China Trade,* 837 F.2d at 35–36 (quoting *Davis,* 767 F.2d at 1038 and *Canadian Filters,* 412 F.2d at 578).

109. *Davis,* 767 F.2d at 1038.

action; (3) threat to the enjoining court's jurisdiction; (4) the foreign proceedings' prejudice to other equitable considerations; (5) delay, inconvenience, expense, inconsistency or race to judgment engendered by adjudication of the same issues in separate actions.[110]

Here, the alignment of the parties in the concurrent proceedings is not identical: Al Fayed is not a plaintiff in the London Action but is a defendant in the case before this Court. But even if, as Dow Jones contends, Harrods and Al Fayed are effectively the same party for the purposes of this motion,[111] the Court is not persuaded, as discussed above, that granting declaratory relief in this action would be dispositive of the litigation in Britain. Because the essential purpose of this Court's declaratory relief and attendant injunction in aid of it would be to nullify the United Kingdom's exercise of jurisdiction in the London Action, there is no certainty that the English courts would honor the Court's judgment. In fact, a substantial basis and greater likelihood may then exist to justify the British tribunals' issuing a counterinjunction designed to protect their own rightful assertion of adjudicatory power.[112]

Dow Jones, citing *Farrell*, nonetheless argues that the test of whether this Court's judgment is dispositive does not rest on whether or not the English tribunals choose to respect this Court's resolution of the dispute, but on whether the subject matter of the competing actions is substantially the same. Dow Jones contends that under an application of the American single publication rule, the pro-

ceedings in the London Action and the case before this Court are substantially the same. The Court finds Dow Jones' premise and reasoning unpersuasive. Application of the American single publication rule would be only the means by which this Court would justify disrupting the London Action. However, that course would not necessarily ensure, given the extraterritorial intrusion, that the matter would conclusively rest there. Nor, however the circumstances underlying the two cases may be parsed, can this Court convincingly conclude that the two actions in question, even if the parties were identical, are substantially the same. With regard to the April 5 Article, Dow Jones seeks a declaration of non-liability under an application of American libel law principles on the theory that the publication occurred in the United States and that Dow Jones did not have sufficient connection with any injury the article may have caused Harrods in England. The London Action, on the other hand, entails a claim of liability asserted under English law for a wrong that allegedly was committed in England to a British national. Second Circuit doctrine instructs that in such circumstances the principle of international comity comes into play and that the Court should not restrain the foreign proceeding, even if denial of relief would require the party seeking the injunction to defend the related or even identical action brought under foreign law.[113]

Moreover, assuming that the London Action entails application of British law to a cause of action arising in the United

---

110. *See China Trade,* 837 F.2d at 35 (citing *Am. Home Assurance Corp. v. Ins. Corp. of Ireland, Ltd.,* 603 F.Supp. 636, 643 (S.D.N.Y. 1984)).

111. *See MasterCard Int'l Inc. v. Argencard Sociedad Anonima,* No. 01–CV–3027 2002 WL 432379, at *1, 5 (S.D.N.Y. Mar. 20, 2002)

112. *See infra* notes 129–130, 161–164 and accompanying text.

113. *See Computer Assocs.,* 126 F.3d at 371–72; *China Trade,* 837 F.2d at 35–36.

Kingdom, there was legitimate basis for Harrods to be in the British court, and that forum would have sufficient jurisdictional ground to adjudicate the underlying dispute free from any interference by this Court. There is evidence of sufficient relationship between the United Kingdom and the litigants and the underlying events and injury to presumptively render the exercise of jurisdiction by the British court not unreasonable.[114] Insofar as it may be ultimately determined that Dow Jones maintains sufficient presence or conducts substantial business activities in the United Kingdom,[115] and has paying online or print subscribers to whom the April 5 Article may have been published there, or that its publication of the April 5 Article, even if it had occurred outside Britain, had a substantial, direct and foreseeable effect within the United Kingdom, Dow Jones may have subjected itself to the application of Britain's laws and the jurisdiction of its courts, at least with regard to those activities.[116] It therefore would not "offend 'traditional notions of fair play and substantial justice' "[117] for courts in the United Kingdom to exercise jurisdiction over Dow Jones and compel it to defend injuries allegedly caused by its commercial activities there. Nor could such action deprive Dow Jones of any reasonable expectations in the conduct of its business affairs in the United Kingdom.

While Dow Jones asserts that the April 5 Article was published only in the *Journal*'s United States print editions and on its WSJ.com website, the Court has no basis to find as a matter of fact or law that the publication did not occur in Britain to a degree sufficient to cause harmful effects there justifying exercise of jurisdiction by the British court. That is a factual issue integrally connected with the merits of what the British tribunal's jurisdiction was invoked to resolve. Until Britain's courts rule on the matter, this Court, even if it possessed concurrent jurisdiction over some aspects of the controversy and honoring the doctrine of international comity discussed below in greater detail, should defer to the proceedings in the foreign tribunal where the matter properly lies.[118]

Turning to the other side of the scale, the interest of the United States in protecting the freest possible exercise of constitutional speech and press freedoms by its nationals in this country is undisputably a vital governmental end. However, whatever legitimate jurisdictional contacts and interests the parties in this forum may have to invoke the Court's authority over the controversy would not necessarily be foreclosed by the Court's deference to the British tribunals at this juncture. Those interests could be preserved and asserted in subsequent proceedings in the United

---

114. *See Restatement (Third) of Foreign Relations, supra,* § 421.

115. *See supra* note 45.

116. *Id.; see also Dicey's Conflict of Laws, supra,* ch. 10, Rule 22 at 174–76 (noting that courts in England have jurisdiction to entertain an action in personam if a corporate defendant is present in England through the conduct of business over a substantial period of time); *id.,* ch. 10, Rule 25 at 201–2 (noting that British courts may assume jurisdiction to adjudicate an action founded on tort committed in England and that the tort of defamation is committed where the defamatory statement

is published or received and not where it is posted or uttered).

117. *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).

118. *See China Trade,* 837 F.2d at 36 (" '[P]arallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other.' ") (quoting *Sabena,* 731 F.2d at 926–27); *Computer Assoc.,* 126 F.3d at 371–72.

States depending on the ultimate outcome of the London Action.

Moreover, addressing the content of the publication itself, though Dow Jones minimizes its April 5 Article as a jocular response to Harrods' April Fool's prank, given the sensitivity of the time and the context when the term "Enron" was being grafted onto the English language,[119] whatever view this Court may have about the reality of any injury caused by such a remark, it cannot summarily declare that a defamation action commenced in the forum where the injury allegedly occurred and under laws of that jurisdiction invoked by its nationals, must necessarily be dismissed as a matter of law as frivolous and motivated by unconscionable bad faith.

With regard to the factor of public policies, the Second Circuit has instructed that an injunction may be appropriate when a party seeks to evade important policies of the forum state by commencing litigation in a foreign court.[120] The Circuit Court stressed, however, that while an attempt to evade compliance with laws of the forum state that effectuate important public policies may justify a restraining order, such relief "is not appropriate merely to prevent a party from seeking slight advantages in the substantive or procedural law to be applied in a foreign court."[121] On this point, the *Sabena* court elaborated that: "An impermissible evasion is much more likely to be found when the party attempts to elude compliance with a statute of specific applicability upon which the party seeking an injunction may have relied, and which is designed to effectuate important state policies."[122]

There is no evidence here that Harrods' London Action was necessarily motivated by attempts to avoid compliance with American law or important public policy. Rather, the foreign litigation seems grounded on a British subject's wish to avail itself of the substantive or procedural law applicable in the jurisdiction where the alleged injury occurred.

Finally, concerning considerations of claimed vexatiousness, expense and inconvenience associated with defending foreign litigation, Second Circuit doctrine instructs that these factors alone do not suffice to warrant injunctive relief intended to restrain parties within the Court's jurisdiction from litigating a related matter in a foreign court, and thus must yield ground to interests and concerns compelled by principle of international comity.[123]

Absent more compelling circumstances than those alleged here, this Court cannot agree that it is an appropriate purpose of the DJA to apply the statute's remedy as a protective shield on behalf of a potential defendant against the costs and bothers of litigation, whether foreign or domestic, even when that litigant asserts First Amendment rights as a basis for relief.

### 4. Preemptive Judgments

In the final analysis, what Dow Jones' resort to the DJA amounts to is an anticipatory interposition of a defense as affirmative armor to ward off damages from a potential tort action by preemptively procuring a federal declaration of non-

---

119. The Court here recognizes that much of the word's rapid etymology developed connotations, as noun, verb and adjective, commonly understood to be derisive (indeed some of them defined and promoted by late-night comedians).

120. *See China Trade,* 837 F.2d at 37.

121. *Id.* (quoting *Sabena,* 731 F.2d at 931, n. 73); *see also Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

122. 731 F.2d at 931 n. 73.

123. *See id.; Computer Assoc.,* 126 F.3d at 372.

liability. In *Wycoff* the Supreme Court provided some guidance relevant to a proper analysis of this circumstance: [124]

> Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not the defense, which will determine whether there is federal-question jurisdiction in the District Court. If the cause of action, which the declaratory defendant threatens to assert, does not *itself involve a claim under federal law*, it is doubtful if a federal court may entertain an action for a declaratory judgment establishing a defense to that claim. This is dubious even though the declaratory complaint sets forth a claim of federal right, if that right is in reality in the nature of a defense to a threatened cause of action. Federal courts will not seize litigations from state courts merely because one, normally a defendant, goes to federal court to begin his federal-law defense before the state court begins the case under state law.

Similarly, in *Brillhart v. Excess Ins. Co. of Am.*,[125] the Supreme Court noted that "[o]rdinarily it would uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issue, *not governed by federal law*, between the same parties." The principle that *Wycoff* and *Brillhart* articulate, as applied by other courts, should be equally apt in a case where, as here, the alternate forum involved is a tribunal in a foreign nation and the declaratory defendant's asserted or threatened cause of action with which the federal litigation conflicts or duplicates arises under the laws of that country.[126]

The Court is mindful that there are circumstances in which anticipatory judgments of non-liability may be appropriate under the DJA, particularly in regards to claims asserting unaccrued or undefined rights or obligations arising under contractual relations such as insurance and intellectual property.[127] However, where the purported use of the DJA seeks a declaration of non-liability to preemptively defeat actions grounded on tort claims involving rights already accrued by reason of alleged wrongful conduct, various courts have held that that application is not a warranted purpose of the DJA.[128] The Seventh Circuit, for example, characterized the use of the statute to compel potential personal injury plaintiffs to litigate their claims at a time and in a forum chosen by the alleged wrongdoer as a "perversion of the Declaratory Judgment Act." [129]

Here, the character of the action pending in the foreign jurisdiction is a tort suit charging defamation, and the purpose Dow

---

**124.** 344 U.S. at 248, 73 S.Ct. 236 (citations omitted) (emphasis added).

**125.** 316 U.S. 491, 495, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942) (citations omitted) (emphasis added).

**126.** *See Basic*, 949 F.Supp. at 1340; *see also Cunningham*, 407 F.2d at 1167.

**127.** *See, e.g., Salomon Bros., Inc. v. Carey*, 556 F.Supp. 499, 501 (S.D.N.Y.1983).

**128.** *See, e.g., Cunningham*, 407 F.2d at 1167–68.

**129.** *See also BASF Corp. v. Symington*, 50 F.3d 555, 559 (8th Cir.1995) (holding that "where a declaratory plaintiff raises chiefly an affirmative defense, and it appears that granting relief could effectively deny an allegedly injured party its otherwise legitimate choice of the forum and time for suit, no declaratory judgment should issue."); *Morrison v. Parker*, 90 F.Supp.2d 876, 880–81 (W.D.Mich.2000); *Sun Oil Co. v. Transcontinental Gas Pipe Line Corp.*, 108 F.Supp. 280, 282 (E.D.Pa.1952), *aff'd*, 203 F.2d 957 (3d Cir.1953); *see generally* 10B *Wright, Miller & Kane, supra*, § 2765 at 638–39.

Jones asserts in this Court amounts to a federal-law affirmative defense intended to frustrate the other proceeding and thus permit Dow Jones to avoid having to defend foreign litigation it deems vexatious where the underlying dispute arises under foreign law. By these means, an anticipatory restraining order of this Court would wrest the action from the London court before it is fully heard there under British law, and it would enable Dow Jones to invoke the preclusive effect of this adjudication in any future action between the parties arising from the same events. The Court finds that this application of the DJA, for a tactically preemptive purpose of declaring non-liability so as to guard against a tort action brought by a foreign national in a court of another country and arising under foreign law, is not within the contemplated purposes of the DJA.[130]

### 5. Unique Complexities of Public Policy

The Court has also weighed an additional point that bears on whether the purposes of the DJA would be properly advanced by declaratory and injunctive relief in this action. That consideration arises from the unique, complex international dimensions implicated in the case, as already touched upon above. We live in a world of ever-expanding transportation, communications and commerce across national borders. More than ever, people, and their goods, services and information, travel from one country and are able to reach the remotest villages of other nations—a reality enlarged manifold in modern times by instant means of the worldwide web, online shopping and electronic messaging. Correspondingly, as people and products and information move more freely and rapidly across territorial lines, national interests expand, response time to events contracts, and the world becomes more economically interdependent. But also enlarging are the number and complexity of the legal problems associated with various forms of international communication and commerce.

Private enterprise has tapped into the vast opportunities and new markets opened by modern technologies, with the industrial movements accompanied by significant related shifts in social, economic and political preferences around the world. As companies knowingly and willingly avail themselves of these business opportunities, they necessarily embrace the protections of the laws of foreign jurisdictions to foster the benefits of their ventures. At the same time, as the law has many edges, businesses operating in foreign lands inevitably encounter the opposite—more incidence of scrutiny by foreign legal regimes, the sharper sides of public rules and policies intended to deter, punish and compensate for the bad effects of international activities.

Expansion of worldwide business interests and communications by multinational corporations thus not only means a broader reach for products and services, but also greater likelihood that aspects of that trade will become ensnared in circumstances governed by the laws of other countries, or regulated by both domestic and foreign rules. In this context, for the nations of the world to maintain the freest and most orderly flow of people, products and services and related communications, no one sovereign state's laws would suffice. Of necessity, to maximize the economic advantages, social goods and legal expectations of citizens of any one country, both sellers and consumers, every state may encounter occasions when it must depend upon the legal system of other sovereigns to advance particular national interests

---

130. See *Wycoff*, 344 U.S. at 247–48, 73 S.Ct. 236; *Cunningham*, 407 F.2d at 1167.

where it may be mutually beneficial to do so.

In this global mercantile environment, it is not at all unusual that conflicts involving the application of competing laws would regularly occur. Goods produced in one country may cause injury in another; conduct legally engaged in one place may offend norms and values prevailing in others; an act in one nation may produce consequences, intended or not, in another; business standards and practices prescribed or tolerated in one forum may be deemed wrongful or even barbaric elsewhere, or regulated by materially different ways and means.

Amid the rapid expansion of international commerce and the emergence of a larger, interdependent global economy, and from the clashes of cultures, conflicts of laws, competing assertions of jurisdiction over the same parties or events, as well as tensions over national policies and international politics, countless delicate legal and public policy questions are bound to arise, and to do so with correspondingly larger frequency. How far may one state reach to protect its citizens from the control of conduct and application of foreign laws that govern their activities in other countries? What conduct occurring within the territorial borders of a state causing harm in another, and what wrongs committed by nationals, or by foreigners outside a state causing adverse effects within its territory, may a state properly regulate? Which state is the proper forum for the resolution of international disputes that fall into recognized jurisdictional interstices and gray zones?

The precise frontiers of these and other sensitive issues remain blurry, constantly evolving, and far from settled. Drawing those lines is always a delicate matter, even after many centuries of international experience. The contours of resolution is the subject of perennial discourse in legislative and other political forums all over the world. To be sure, at proper times and places a legitimate role exists for the judiciary in these endeavors. Cases and controversies surely arise that warrant occasion for courts to add their rightful perspectives and contributions to inform these debates in the context of resolving real disputes validly before them.

When all is said and done, two things are clear and warrant emphasis. First is that these international conflicts are inherently complex matters, some of the intricacies necessarily abstract and intensely political. Often the underlying issues encompass more than legal questions. To untangle the attendant controversies frequently requires considerable time and resources, and sometimes the combined energies and contributions of multiple jurisdictions. Definitions of rights and declarations of relations that arise from such international uncertainties do not readily lend themselves to facile rules or momentary relief that in the long run settle nothing. Rather, as technological advances alter the spacial and temporal dimensions of the world, the goals of enhancing the benefits of global markets for particular countries and promoting commercial intercourse in the interest of the international community as a whole compel that, in resolving legal disputes properly before them that raise international implications, tribunals in all nations render judgments that are consistent with fostering broader cooperation and good will, and that encourage mutual sovereign respect and the international rule of law among states.

In this context, it is harder to foresee what the precise role of the judiciary will be than to forewarn of what it should not be. Absent extraordinary circumstances, it would not comport with considerations of "practicality and wise administration of

justice"[131] for the courts of one nation as a matter of course to sit in judgment of the adequacy of due process and the quality of justice rendered in the courts of other sovereigns, and to decree injunctive relief at any time the forum courts conclude that the laws of the foreign jurisdiction under scrutiny do not measure up to whatever the scope of rights and safeguards the domestic jurisprudence recognizes and enforces to effectuate its own concept of justice.[132] On this larger scale, there can be no room for arrogance or presumption, or for extravagant rules or practices that may encourage insularity or chauvinism rather than respect for comity. It cannot be the proper province of any one judge in any one country, giving expression to the push of a moment or the pull of the immediate case, to promulgate judgments that impose that court's rule and will across all sovereign borders so as to reach the rest of humankind.

For, in the rules of the international arena, premised as they are on the nearly immutable concept of even sovereignty and the co-equality of states, arrogation is often infectious. In response to one nation's tendency to overreach, it does not take long for the ill-effects to catch on, and for others to reciprocate, requiting sovereign indignity with indignity. The consequences of precipitous, ill-considered action by a court in one jurisdiction could produce corresponding repercussions in other countries. On this point, it is well to recall the guidance of the Supreme Court when it admonished that

> [i]n dealing with international commerce we cannot be unmindful of the necessity for mutual forbearance if retaliations are to be avoided; nor should we forget that any contact which we hold sufficient to warrant application of our law to a foreign transaction will logically be as strong a warrant for a foreign country to apply its law to an American transaction.[133]

Specifically, an injunction issued by one forum restraining parties from pursuing litigation pending in a foreign tribunal with jurisdiction over the matter could invite a duel of injunction and counterinjunction to thwart the attempt of the enjoining court to exercise exclusive jurisdiction and protect the foreign state's own judicial power.[134] As the *Laker Airways* court noted, in a dispute depicting precisely this dynamic: "The consequences to international trade and to amicable relations between nations that would result from this kind of interference are difficult to overestimate."[135]

In this customary tit-for-tat global environment, special caution and sensitivity to guard against potential retaliation against American foreign interests would be a proper consideration for this Court to weigh.[136] The vast expanse of American

**131.** *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).

**132.** *See Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 981 (2d Cir.1993) ("[I]t is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another foreign nation.") (quoting *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir.1991)).

**133.** *Lauritzen v. Larsen*, 345 U.S. 571, 582, 73 S.Ct. 921, 97 L.Ed. 1254 (1953)

**134.** *See Sabena*, 731 F.2d at 934 (noting among cases where this intercourt injunctive combat was recorded *James v. Grand Trunk Western R.R. Co.*, 14 Ill.2d 356, 152 N.E.2d 858, *cert. denied*, 358 U.S. 915, 79 S.Ct. 288, 3 L.Ed.2d 239 (1958) and *Bryant v. Atl. Coast Line R.R.*, 92 F.2d 569 (2d Cir.1937)). The controversy at issue in *Sabena* itself, detailed *infra*, note 166, presents a quintessential example of this harmful potential.

**135.** 559 F.Supp. at 1132.

**136.** In *Hilton*, the Supreme Court, in what appeared to be dictum, purportedly established a requirement of reciprocity for recognition of foreign judgments. *See* 159 U.S. at

international interests validates this concern and lends relevance and prudence to its consideration by the Court. American corporations do business and have affiliates in almost every corner of the globe. On a proportionate scale, United States nationals probably engage in international travel, commerce and communication, and hence are parties to litigation arising from these activities, in larger numbers than citizens of other countries. Consequently, our judicial attitudes on matters of international comity, the level of recognition and respect our courts accord to foreign proceedings, could have significant bearing on the treatment American litigants receive when their disputes reach the tribunals of foreign countries for resolution. Given the range of their international interests, Americans thus could stand to bear the brunt of adverse consequences in jurisdictional battles that potentially could be ignited by unwarranted rulings of our own courts on matters that unjustifiably hinder the assertion of judicial power by other sovereign states.

The second note worth underscoring, and more to the point here at issue, is that questions charged with the moment, scope and intricacies of substantial international disputes defy solutions under the aegis of a jurisdictional mechanism that confers only discretionary authority upon federal courts, and whose underlying purpose speaks of fostering efficiencies, of promoting speed, economy and effectiveness in the resolution of private conflicts and of encouraging the conclusive clarification of rights, relations and remedies among litigants. It is precisely for these reasons that the Supreme Court has counseled against the application of the DJA in controversies entailing complex issues of public law or constitutional dimensions fraught with doubt.[137]

228, 16 S.Ct. 139; Ehrenzweig, *Conflict of Laws, supra,* § 46, at 165. Broad criticism and rejection of the doctrine in this country has cast doubt on its continued vitality as an absolute prerequisite to comity. *See Sabena,* 731 F.2d at 939; *Tahan v. Hodgson,* 662 F.2d 862, 864, 867–68 (D.C.Cir.1981); Ehrenzweig, *supra,* § 46, at 165–66. While generally reciprocity is not imposed by British courts under common law, in other countries it remains a recognized practice or consideration in giving recognition to judgments or proceedings of other sovereign states. *See generally* Arthur T. von Mehren & Donald T. Trautman, *Recognition of Foreign Adjudications: A Survey and Suggested Approach,* 81 Harv. L.Rev. 1601, 1660–62 (1968); Courtland H. Peterson, *Foreign Country Judgments and the Second Restatement of Conflict of Laws,* 72 Colum. L.Rev. 220, 233–36 (1972); Kurt H. Nadelmann, *Reprisals Against American Judgments?,* 65 Harv. L.Rev. 1184, 1187–90 (1952); Willis L.M. Reese, *The Status in This Country of Judgments Rendered Abroad,* 50 Colum. L.Rev. 783, 790–93 (1950); *Restatement (Second) of Conflict of Laws: Recognition of Foreign Nation Judgments* § 98 cmt. e (1971).

That is not to say however, that in practice, theory universally comports with reality. Noting the limitation on reciprocity, the *Sabena* court stated: "[c]ertainly our law has not departed so far from common sense that it is reversible error for a court not to capitulate to a foreign judgment based on a statute ... designed to prevent the court from resolving legitimate claims placed before it." *See Sabena,* 731 F.2d at 939. Here, *common sense* would similarly suggest that it is highly unlikely that it would escape the contemplation of the British tribunals that in order to protect their exercise of judicial power over a matter properly before them and prevent foreign disruption of their jurisdiction, it would be justifiable for them to counter an arguably doubtful foreign intrusion with their own restraining order.

**137.** *See Public Affairs Assoc. v. Rickover,* 369 U.S. 111, 112–113, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962); *see also Ernst & Young v. Depositors Econ. Protection Corp.,* 45 F.3d 530, 535 (1st Cir.1995); *Washington Pub. Power Supply Syst. v. Pacific Northwest Power Co.,* 332 F.2d 87, 88 (9th Cir.1964); *Frazier v. Ward,* 426 F.Supp. 1354, 1361 (N.D.N.Y.1977).

For the reasons discussed above, Harrods' motion to dismiss Dow Jones' complaint may be granted on this basis as well.

## C. *COURT DISCRETION*

 Even were the Court to find the existence of an actual controversy or an appropriate invocation of the DJA, its inquiry would not necessarily end there. The DJA does not create a source of substantive rights and imposes no duty upon the courts to grant its remedy. By its terms, the statute provides that a federal court *may* declare the rights and other legal relations of any interested party seeking such declaration.[138] This language explicitly confers broad discretion upon the courts to grant or deny declaratory relief "rather than an absolute right upon the litigant."[139] In its most recent pronouncement delineating scope of the district courts' discretion to consider declaratory relief, the Supreme Court reaffirmed not only that the latitude is unique and extensive, but reviewable on appeal under a standard of abuse of discretion rather than *de novo*.[140] In *Wilton*, the Supreme Court stated:

> By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants. Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an

action seeking a declaratory judgment before trial or after all arguments have drawn to a close. In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration.[141]

 The *Wilton* Court thus underscored that even if a court determines that a given DJA case does present an "actual controversy" within its jurisdiction, it is not obligated to exercise judicial authority to resolve the dispute. Rather, it possesses statutory latitude to deny a declaratory judgment where the court finds that granting relief would serve no useful purpose.[142] The Court explicitly instructed that the courts have "discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject-matter jurisdictional prerequisites."[143]

 In essence, the Supreme Court's definition of the district court's extensive DJA discretion reflects a recognition of a necessary alignment of form and function, of a statutory purpose fostering adjudicatory efficiency and a vesting of uniquely broad judicial discretion as a means to that end. In other words, for the DJA procedure to work as envisioned and achieve its desired ends, it is essential for the courts to possess the widest possible flexibility and room to assess the circumstances when the declaratory remedy would be

---

138. *See* 28 U.S.C. § 2201(a).

139. *Wycoff,* 344 U.S. at 241, 73 S.Ct. 236; *Rickover,* 369 U.S. at 112, 82 S.Ct. 580 (noting that the DJA was "an authorization, not a command. It gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so."); *see also Brillhart v. Excess Ins. Co. of Am.,* 316 U.S. 491, 494, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942); *Beacon Const.,* 521 F.2d at 397; *see generally* Edwin Borchard, *Discretion to Refuse Juris-*

diction of Actions for Declaratory Judgments, 26 Minn. L.Rev. 677 (1942) ("Discretion to Refuse").

140. *See Wilton,* 515 U.S. at 277, 289, 115 S.Ct. 2137.

141. *Id.* at 288, 115 S.Ct. 2137.

142. *See id.* at 282, 115 S.Ct. 2137.

143. *Id.*

most useful and effective and when to eschew it in the interest of other principles vital to the efficient administration of justice.

▮▮▮▮ To guide the district courts in exercising the broad discretion the DJA confers, several tests and considerations have been recognized and generally applied. One articulation holds that a court may properly render declaratory judgment "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." [144] Further elaboration of the applicable equitable considerations is articulated in guidance adopted by several other circuit courts. These include (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.[145]

▮▮▮▮ Reviewing all of the circumstances on the record before it in the light of the preceding guidelines and other considerations, this Court, even if it were presented with an actual controversy, would not be inclined to exercise its discretion to render the declaratory judgment Dow Jones requests, and thus grants Harrods' motion to dismiss.

Before articulating the basis for its decision, some preliminary observations are in order. This backdrop may be appropriate both because the Court is mindful of the particular moment of the case and the implications of its holding, and because Dow Jones' argument calls into question the scope of the Court's DJA latitude. Instead, Dow Jones advocates a much narrower standard to govern the exercise of judicial discretion to deny declaratory relief than this Court considers applicable. A much more reasoned articulation elaborating on the notion and breadth of principled discretion the DJA confers, as this Court perceives it, may thus be helpful to an understanding of the rationale and judgment embodied in this ruling.

As a point of departure, the Court acknowledges that Dow Jones' complaint raises weighty issues and identifies burdens and inconveniences, both actual and perceived, that any publisher understandably would devoutly wish to be spared in the exercise of its First Amendment rights. The Court is also mindful of the overall significance of the alleged injuries asserted here, and is not indifferent to Dow Jones's efforts to seek a judicial remedy. Nor is Dow Jones' theory of relief overlooked, even if novel and expansive. Indeed, based on a fair reading of the content and context of the April 5 Article, this Court would have little hesitation finding, under a different posture of the case, that Dow Jones would have a substantial likelihood to prevail on the merits were the remedy Dow Jones proposed limited, such

---

**144.** *Broadview Chem. Corp. v. Loctite Corp.,* 417 F.2d 998, 1001 (2d Cir.1969), *cert. denied,* 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970) (quoting Edwin Borchard, *Declaratory Judgments* 299 (2d ed.1941)).

**145.** *See Grand Trunk Western R.R. Co. v. Consol. Rail Corp.,* 746 F.2d 323, 326 (6th Cir. 1984); *NUCOR Corp. v. Aceros Y Maquilas de Occidente,* S.A. decl. C.V., 28 F.3d 572, 577 (7th Cir.1994); *see generally* 10B *Wright, Miller & Kane, supra,* § 2759, at 547–48.

as it was in *Yahoo!*, to a declaration to the effect that a judgment arising from a judicial order actually rendered and sought to be executed in the United States would not be cognizable under American jurisprudence governing freedom of expression, and hence would be unenforceable in United States jurisdictions, insofar as it found defamation liability based on the April 5 Article under a clear and specific application of abhorrent libel law principles such as those Dow Jones asserts govern the London Action.[146]

But this theoretically cognizable fact pattern is not the case Dow Jones presents to the Court. Instead, Dow Jones' prayer for relief pushes far beyond the bounds of what this Court considers practical and remediable, and expands into the zone of what it regards as exceeding the Court's reasonable latitude under the declaratory judgment statute. For, Dow Jones' contentions implicate issues of national policy, constitutional law and international affairs that transcend the particulars of the matter before the Court. Thus, even if it arose from a joke, the case cannot be viewed in isolation as a narrow dispute between Dow Jones and Harrods. Rather, Dow Jones' claims, and what the Court is called to do to recognize and authorize relief to protect Dow Jones' interests, must be weighed against the import of this action not only to the interests of other litigants, but to the perils that inhere in the Court's entry of an empty judgment.

As already discussed, the Court considers it doubtful that its ruling would gain recognition in a foreign jurisdiction for the purpose it would purport to achieve insofar as the adjudication would necessarily rest on value-laden judgments about the adequacy of justice in a tribunal of another sovereign whose jurisdiction to adjudicate a dispute—brought by a party properly invoking the forum's authority and according to its laws—this Court decidedly would frustrate were it to grant the remedy here requested.

In Dow Jones' view, the Court's discretion to pass upon an application for declaratory judgment *"must"* be exercised to accept jurisdiction upon a finding of only two particular factors: when a judgment would (1) serve a useful purpose in clarifying and settling the legal relations at issue, and (2) terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding.[147] The Court does not regard its discretion as so constricted or guided solely by these two criteria.

As a backdrop for the considerations that inform the Court's view of the scope of its discretion and the reasoning that compels its judgment, it is well to recall the fundamental philosophy that underlies the judicial leeway conferred by the DJA, as emerges from the various self-imposed rules the courts have enunciated and followed over the years defining the proper exercise of DJA authority.

In enacting the DJA, Congress empowered the federal courts with a useful means to resolve disputes more expeditiously and economically. No doubt, as already discussed above, the success of the legislation and the intended utility and value of its remedial purpose, rest upon liberal application and flexible administration of the statute.[148] Achievement of these ends, in turn, depends on the investiture of authority upon the courts consonant with

146. *See Yahoo!*, 169 F.Supp.2d at 1194.

147. Pl.'s Memo, at 17 (quoting *Farrell*, 32 F.Supp.2d at 124 and *Texport Oil Co. v. M/V Amolyntos*, 11 F.3d 361, 366 (2d Cir.1993)).

148. *See, e.g., Beacon Constr.*, 521 F.2d at 397; 12 *Moore's Federal Practice, supra*, § 57.03[3], at 57–12 to 57–14.

the purposes and usefulness of the tool. In practice, the Supreme Court, early in the statute's history, recognized that the range of the courts' DJA discretion necessarily must be expansive.[149] In *Brillhart,* offering guidance on declaratory judgment criteria the courts may consider, the Court noted: "we do not now attempt a comprehensive enumeration of what in other cases may be revealed as relevant factors governing the exercised of a district court's discretion." [150]

More recently, in *Wilton,* the Supreme Court not only reaffirmed that the breadth of that authority is greater but underscored its uniqueness in relation to the range of judicial leeway Congress has vested in other discretionary contexts.[151] While the Supreme Court rejected a constraining standard that would have required a showing of "exceptional circumstances" to justify the district courts' refusal to accept jurisdiction, it again declined to delineate the "outer boundaries" governing the exercise of that discretion.[152] As the *Wilton* Court observed:

> Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion.... The statute's textual commitment to discretion and the breadth of leeway we have always understood it to suggest, distinguish the

declaratory judgment context from other areas of the law in which concepts of discretion surface.[153]

Of course no grant of judicial discretion can ordain justification so broad and subjective as to match what Lucetta deigned enough: "I have no other but a [judge's] reason: I think [it] so because I think [it] so." [154] In fact, honoring the indefinite task that the DJA's maneuvering space has entrusted to them, the courts have recognized that their discretion is not without limits, but that in practice the exercise of DJA jurisdiction "has been hardened by experience into rule." [155] Both in expression of what is workable and reasonably contemplated within the purposes of the statute, and as a marker of what might cross the line into abuse of the courts' valid authority, case law records some pertinent guidance.

As perhaps the paramount measure of restraint, the courts require that any declaratory remedy granted must be useful and effective.[156] Dismissal of a declaratory action is proper when any judgment entered has no practical means of enforcement.[157] To further confine declaratory relief to solutions that are relatively expeditious and economical both to the parties and the courts, pertinent guidelines counsel against accepting jurisdiction where major controversial issues of public law or constitutional dimensions are involved. In

---

**149.** *See Brillhart,* 316 U.S. at 495, 62 S.Ct. 1173.

**150.** *Id.*

**151.** *See Wilton,* 515 U.S. at 286–87, 115 S.Ct. 2137.

**152.** *Id.* at 286, 290, 115 S.Ct. 2137.

**153.** *Id.* at 286–87, 115 S.Ct. 2137 (internal citations omitted).

**154.** William Shakespeare, *The Two Gentlemen of Verona,* Act I, Sc. II, line 23.

**155.** Borchard, *Discretion to Refuse, supra,* 26 Minn. L.Rev. at 682.

**156.** *See, e.g., Starter Corp. v. Converse, Inc.,* 84 F.3d 592, 597 (2d Cir.1996).

**157.** *See, e.g., S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exchange, Inc.,* 24 F.3d 427, 431–32 (2d Cir.1994), *Browning Debenture Holders' Comm. v. DASA Corp.,* 524 F.2d 811, 817 (2d Cir.1975).

this connection the Supreme Court has "[c]autioned against declaratory judgments of issues of public moment, even falling short of constitutionality, in speculative situations." [158] In *Ernst & Young*,[159] the First Circuit similarly instructed that "[t]he discretion to grant declaratory relief is to be exercised with great circumspection when matters of public moment are involved ... or when a request for relief threatens to drag a federal court prematurely into constitutional issues that are freighted with uncertainty." [160]

Courts also avoid unnecessary conflicts with other jurisdictions considering related actions involving the same parties, and defer to those forums where appropriate.[161] In so doing, they are mindful not only of the mutual respect that the corresponding tribunals should accord each oth-

er in the interest of fostering their shared missions and public functions of doing justice, but recognize that to that end nothing gainful would be served by unwarranted interference with the proper exercise of the other court's jurisdiction.[162] Intrusions upon another sovereign's legitimate functions and counterproductive assertions of power work either to prolong or proliferate litigation, and ultimately to invite a battle of reciprocity.[163]

These jurisdictional skirmishes are no mere hypotheticals. They have arisen in other contexts, and their harmful effects and implications for foreign relations have been recorded.[164] Notable examples presenting issues analogous to those now before this Court have arisen in international antitrust and intellectual property infringement disputes.[165] The complex maneuvering, protracted proceedings, contra-

---

158. *See, e.g., Rickover*, 369 U.S. at 112, 82 S.Ct. 580 (citing *Eccles v. Peoples Bank*, 333 U.S. 426, 432, 68 S.Ct. 641, 92 L.Ed. 784 (1948)).

159. 45 F.3d at 530.

160. *Id.* at 535 (citing *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 494 (1st Cir.1992) and *Washington Pub. Power*, 332 F.2d at 88). In *El Dia*, the First Circuit noted that a factor courts should always consider in determining whether to grant declaratory relief in constitutional cases is "the need for courts to be chary of adjudicating constitutional rights by means of declaratory judgment actions. Uncertain questions of constitutional law should be addressed only when absolutely necessary." 963 F.2d at 494 (citing *Alabama State Fed'n of Labor v. McAdory*, 325 U.S. 450, 461, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945)). The Circuit Court also cautioned that courts should withhold declaratory relief as a matter of discretion "if such redress is unlikely to palliate, or not needed to palliate, the fancied injury, especially when refraining from issuing a declaratory judgment 'avoid[s] the premature adjudication of constitutional issues.'" *Id.* (quoting *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019–20 (D.C.Cir. 1991), *cert denied*, 503 U.S. 950, 112 S.Ct. 1513, 117 L.Ed.2d 650 (1992)).

161. *See Brillhart*, 316 U.S. at 495, 62 S.Ct. 1173; *Wycoff*, 344 U.S. at 247–48, 73 S.Ct. 236.

162. *Id.*

163. *See, e.g., Basic*, 949 F.Supp. at 1341; *see also Sabena*, 731 F.2d at 909; *British Airways Bd. v. Laker Airways, Ltd.*, [1985] A.C. 58.

164. *See, e.g., Computer Assoc.*, 126 F.3d at 371–72; *Laker Airways Ltd. v. Pan American World Airways*, 559 F.Supp. 1124 (D.D.C. 1983), *aff'd sub nom, Laker Airways v. Sabena*, 731 F.2d 909 (D.C.Cir.1984); *British Airways Bd.*, [1985] A.C. 58.

165. In antitrust cases, for example, the clash is typically triggered by a litigant in one jurisdiction seeking an antisuit injunction from the court in the forum state in an attempt to bar a competitor from prosecuting an action asserting antitrust violations arising from claims of wrongful practices that allegedly occurred in another country and that are being litigated there under what the party seeking to enjoin the proceeding asserts is extraterritorial application of the laws of that jurisdiction. *See, e.g., Sabena*, 731 F.2d at 915–916; *see generally* John H. Chung, *The International Anti-Trust Enforcement Assistance Act of 1994 and the Maelstrom Surrounding the Extraterritorial*

dictory judgments and lengthy appeals in the courts of different countries involved, and the combination of delicate international political, economic and cultural issues implicated in these controversies, all underscore why it would be particularly inappropriate, as the procedural means to pursue such intricate, public policy-laden litigation, to invoke a statute whose primary aim is to promote swift and efficient declaration of rights and to bring finality to legal conflicts.[166]

In synthesis, a common theme runs like an undercurrent through these self-imposed boundaries on the reach of the courts' DJA discretion. When all the lines are drawn and the terms of limitation are

spelled out, and when rules of caution are put to the test, however finely the distinctions cut, what remains of the courts' demarcation of their discretionary role is a case-by-case approach circumscribed by recognition that what the statute bestows upon them is discretion, not ambitions; that a free hand does not mean free rein, and that in practice, in giving expression to the confidence Congress reposed upon them, the courts' response should be measured and orderly.

Closer to home, in this Court's own conceptualization of the DJA's discretionary mandate, because the charge is purposefully broad and flexible, and because the trust is so generous, the courts owe bal-

---

*Application of the Sherman Act,* 69 Temp. L.Rev. 371 (1996).

**166.** The Laker Airways litigation serves to illustrate the pernicious effects of these international legal standoffs. There, Laker Airways, an air carrier chartered in the United Kingdom, filed suit in 1982 in the federal court in the District of Columbia. The complaint alleged an extensive conspiracy under which British Airways and several other domestic and foreign airlines engaged in predatory practices designed to drive Laker out of the business of providing low-fare "no-frills" travel in the routes from the United Kingdom to the United States. In 1983 British Airways and British Caledonia Airways, later joined by other carriers named defendants in Laker's antitrust action, commenced an antisuit action in the High Court of Justice in London seeking a declaration of non-liability and permanent injunction prohibiting Laker from continuing its antitrust action in Washington. British Airways argued that Laker's antitrust claims were frivolous and vexatious, and that Laker's conduct in initiating litigation in the United States was motivated by unconscionable bad faith.

The court in the London action apparently accepted the proposition that because of the way the American legal system is structured, compounded by the expense entailed in the discovery process, the British defendants were unlikely to receive justice in American courts. It issued an interim order enjoining

Laker from pursuing its suit against the two British carriers in the United States. *See Laker Airways,* 559 F.Supp. at 1128–29. Shortly thereafter, Laker obtained a temporary restraining order from the district court in the Washington litigation prohibiting several foreign airlines from joining the antisuit action in Britain. *See id.* The district court perceived the London tribunal's order as inconsistent with the doctrine of international comity and considered its issuance of federal injunctive relief as warranted to preserve the court's rightful jurisdiction. *See id.* at 1138–39. The Court of Appeals for the District of Columbia Circuit affirmed. *See Sabena,* 731 F.2d at 956. On an appeal in the London Action, the House Lords subsequently reversed the lower court's issuance of the original injunction. *See British Airways,* [1985] A.C. at 84 (opinion of Lord Diplock). The House of Lords held that because both Laker and the two British airlines, by reason of their business operations in the United States, subjected themselves to American territorial jurisdiction and antitrust laws, there was nothing sufficiently unconscionable or unjust in Laker's conduct in pursuing litigation in American courts so as to justify a British court's exercise of proper judicial discretion to enjoin Laker's action. Of significance to the principle before this Court was the British tribunal's recognition of the potential interference that a restraining order in the London proceedings would have on the judicial process in the United States. *See id.* at 95 (opinion of Lord Scarman).

anced exercise of authority hedged by manifest logic, reasoned articulation and principled restraint. To the task of resolution they should bring to bear the wisest impulses and draw from the best experience that go into the mix of sound judgment. At bottom, these principles counsel that the Court's declaratory judgment call should of course be guided as always by its place in realizing the higher aspirations of the law, but that it also must do so taking account of the practicalities and constraints that ordinarily attend the fair and orderly administration of justice, and that define the proper roles and reach of judicial power. As the Supreme Court noted in *Wilton:* "[i]n the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." [167]

In this spirit, the Court turns to specific reasons that compel its rejection of Dow Jones' reading of the DJA and denial of the declaratory and injunctive relief sought here.

### 1. *Resolution of the Controversy*

The court is not persuaded that issuing the remedy requested will necessarily resolve the controversy between the parties. The ruling Dow Jones urges would declare that under applicable American legal principles, a judgment in the London Action based on the April 5 Article would be unenforceable in the United States and, under American legal doctrine, anywhere else. The Court considers first the practicalities surrounding this claim.

The defamation claim asserted in the London Action is grounded on the application of British law. By this Court's reckoning of realities and probabilities, insofar as the Court were to endeavor to stretch the range of its powers to enjoin litigation pursued by a party in the foreign country of its nationality that is based on that forum's own law, to recover damages for an injury alleged to have been committed and suffered in that jurisdiction, it is highly improbable that its determination would conclusively settle the dispute. Rather, it is more likely that an order purporting to effect a universal assertion of American substantive law and judicial power employing to that end a dubious, novel or overly aggressive application of a discretionary remedy under a procedural statute, would be perceived as a judgment motivated not by a purpose to see that justice is done somewhere in this case through a speedy, efficient and economical resolution of the merits of the dispute, but prompted instead by tactical maneuvering designed to undermine the exercise of judicial authority by a British court in a matter properly within its jurisdiction.

Under those circumstances, rather than definitively settling the rights of the parties, this Court's exercise of jurisdiction would spur more litigation. Compounded legal wrangling may ensue both in this forum through further challenges in this Court and later on appeal. More significantly, any ruling of this Court that fails to honor comity in the first instance could produce extended litigation in the London Action and possibly in other jurisdictions outside the United States.[168] An injunc-

---

**167.** 515 U.S. at 288, 115 S.Ct. 2137; *see also Wycoff,* 344 U.S. at 243, 73 S.Ct. 236 (stating that the propriety of declaratory judgment in a particular case "will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power."); *see generally* David L. Shapiro, *Jurisdic-*

*tion and Discretion,* 60 N.Y.U. L.Rev. 543 (1985).

**168.** If shared elements of human behavior continue to hold true across the Atlantic and to sway conduct in similar ways, the manifest indignation the federal courts expressed in the Laker Airways litigation at the original

tive remedy issued here intended to frustrate the application of British law by British courts to operative events allegedly occurring in the United Kingdom in an action brought there by a British national, may very well provide sufficient ground for countermeasures by the British tribunals to exercise judicial power to protect their own jurisdiction over the matter.[169]

There is no certainty, despite Dow Jones' intense speculation to the contrary, that British tribunals would honor any judgment by this Court that, based on application of American law, sought to arrogate jurisdiction and wrench the case away from the British courts before they have had a fair and full opportunity to consider its merits under application of British law.[170] Whatever validity such a long-arm concept may have in the United States, absent a binding agreement between the parties designating a choice of venue, any extraterritorial order this Court might issue will be neither self-

British tribunal's restraining order interfering with the antitrust proceedings in a United States court with proper jurisdiction, especially in the light of the British court's implicit value judgment about the fairness of the American justice system, opens a window into what might be expected as the British judicial response when confronted with a converse of the situation, and may also provide a glimpse of the probable complications and prolongation of the instant case that may ensue were this Court to act in a way regarded by the British tribunals in the London Action as an unjustifiable intrusion into the litigation before they have had an adequate opportunity to rule even on whether the action is properly within British personal jurisdiction or makes out a prima facie case. *See, e.g., Sabena,* 731 F.2d at 933, 938–39.

The *Sabena* court's reaction was hardly muted: "[T]he initial opportunity to exercise comity, if this were called for, was put to the United Kingdom courts. No recognition or acceptance of comity was made in those courts. The appellants' claims of comity now asserted in United States courts come burdened with the failure of the British to recognize comity." 731 F.2d at 939. "[A]lthough our counterparts on the United Kingdom courts may disagree, the English injunctions against Laker cannot be justified as necessary to prevent Laker's evasion of Britain's important public policy of avoiding foreign remedies that could damage British trading interests. The British injunction is not an antisuit injunction designed to protect their jurisdiction to proceed with the case. Rather, its only purpose is to destroy the United States District Court's jurisdiction." *Id.* at 933 n. 81. Noting that the federal judgment at issue was defensive and neither made nor implied any view about the wisdom of British law, the Circuit Court observed that: "[i]n contrast, the English injunction is purely *offensive*—it is not designed to protect English jurisdiction, or to allow English courts to proceed to a judgment on the defendant's potential liability under English anticompetitive law free from foreign interference. Rather, the English injunction seeks only to quash the practical power of the United States courts to adjudicate claims under United States law against defendants admittedly subject to the courts' adjudicatory jurisdiction." *Id.* at 938 (emphasis in original). Interchange the references to the United States and the United Kingdom in these passages, and it may yield a fair if discomfitting view of what justifiable reaction may well be provoked when the shoe is squeezed on the other foot.

**169.** Under British law, courts in the United Kingdom have inherent power, in order to prevent the administration of justice from being perverted for an unjust end, to restrain by injunction the institution or continuation of vexatious or oppressive proceedings in a foreign court or the enforcement of foreign judgments. *See Dicey's Conflict of Laws, supra,* ch. 33, Rule 183, at 1081–84. Arguably, under this standard, such an exercise of authority might be warranted to protect the court's jurisdiction in connection with a foreign case involving the same parties and operative transaction that has as its purpose to interfere with the orderly process of litigation pending before it or to defeat the court's exercise of proper jurisdiction over the parties. *Cf. Sabena,* 731 F.2d at 927.

**170.** *See supra* notes 59–61 and accompanying text.

executing nor in and of itself binding on or recognized by foreign tribunals.[171] Nor does it necessarily follow that were this Court to enter judgment in favor of Dow Jones, the matter would promptly end there, as Dow Jones contends. Appeal of the Court's decision is a distinct probability, given the novel aspects of the case. And there is no assurance that British tribunals would be inclined to forbear consideration of the merits of the proceedings before them for as long as it would require to exhaust all appeals and obtain a final judgment in the instant action in this country.[172]

### 2. *Useful Purpose*

For much the same reasons, granting the declaratory relief Dow Jones seeks would not necessarily serve a useful purpose in clarifying the legal relations between the parties. Dow Jones instituted this action with a view to settle its defamation dispute with Harrods not only in the United Kingdom but anywhere in the world. This Court is not persuaded that an order to this effect would have any value to that declared end. While such a judgment arguably may settle Dow Jones' rights and remove uncertainties concerning the enforceability of a damage award and future publication of the April 5 Article in the United States, it is unlikely to do much to dispose of Harrods' claims in London or elsewhere beyond this country.[173]

To this extent, by granting relief this Court would be rendering judgment unenforceable for the real purposes intended. For, in the final analysis, the game of judicial overreaching often plays out as a two-way street. Just as much as this Court may preemptively declare a foreign judgment based on repugnant legal principles to have no effect in the United States and enjoin parties from proceeding overseas, a foreign tribunal may just as cavalierly ignore this Court's order and command the parties to proceed with their litigation there. Rather than settling the relations between the parties, this outcome may prevent both from obtaining a remedy and serve only a counterproductive end of engendering more litigation.[174]

### 3. *Forum Shopping*

The timing of the events that gave rise to this action suggests that in commencing litigation as and when it did, Dow Jones sought to score a preemptive procedural strike essentially intended to derail the London Action by compelling Harrods to withdraw it.[175] Dow Jones contends that a ruling in this litigation applying American law would likely be given effect by the British court as dispositively solving the parties' conflict, and thus inhibit further proceedings in the London Action and anywhere else. If successful, this strategy presumably would curtail litigation of Harrods' defamation action stemming from the April 5 Article insofar as that claim were

---

**171.** *See supra* notes 63–67 and accompanying text.

**172.** British courts generally refuse to stay their proceedings *pendente lite* in favor of litigation in foreign tribunals because of their "prevailing preference for their own courts." Ehrenzweig, *Conflict of Laws, supra,* § 36, at 127; *see also Dicey's Conflict of Laws, supra,* ch. 33, Rule 183, at 1183.

**173.** *See supra* notes 62–65 and accompanying text.

**174.** *See, e.g., Sabena,* 731 F.2d at 927 (citing *Peck v. Jenness,* 48 U.S. (7 How.) 612, 624–25, 12 L.Ed. 841 (1849)); *see also Lauritzen,* 345 U.S. at 582, 73 S.Ct. 921.

**175.** Dow Jones affirmatively states that its purpose in this Court is to "[s]eek to shut that [London Action] down. As we have said very explicitly, we seek an injunction preventing Harrods from pursuing that action ..." (Tr. at 15.)

held not cognizable in the United States. But the effect Dow Jones seeks would also bar consideration of the question whether a valid judgment could be rendered applying British law, encompassing a wrong and redressing past injury to a British national occurring only within the United Kingdom, and awarding remedies enforceable only where the judgment is recognized.

This Court cannot rule out such an outcome of the London Action as entirely implausible. It is also not inconceivable that a set of circumstances may prevail under which such a solution would satisfactorily resolve the parties' dispute. By restraining Harrods' pursuit of this prospect, however, this Court would not only expand its authority to achieve a result over which its jurisdiction is at best dubious, but would also preclude the parties from pursuing an outcome that theoretically could settle their conflict more expeditiously and efficiently than is likely to prevail by the course Dow Jones presses here.

On this analysis, Dow Jones' litigation in this Court amounts to strategic forum-shopping motivated by pursuit of a tactical edge over an opponent. In essence, it seeks to establish venue here and away from another jurisdiction where the action could properly be brought, and to haul foreign parties into this Court for an application of American law in support of a declaration of non-liability shielding Dow Jones from damages for prior conduct.[176] That in this race to the courthouse Dow Jones managed to file its declaratory action first is immaterial.[177]

A rush to file first in anticipation of litigation in another tribunal, thereby enabling a potential defendant to choose the forum and governing law by which to adjudicate the dispute, and otherwise to interfere with or frustrate the other party's pursuit of claims elsewhere, is one of the equitable considerations a court may weigh in ruling on a request for declaratory relief.[178] The Court is mindful that this factor alone is not dispositive and may yield to other values, especially in cases implicating substantial First Amendment issues. For the reasons discussed above, however, on balance the Court concludes that this consideration nonetheless weighs against the exercise of jurisdiction in this case.

### 4. Conflict With Another Jurisdiction

The Court earlier addressed the implications of extraterritorial jurisdiction as a consideration supporting a finding that no sufficient actual controversy exists in this action. Some of those same complications weigh in favor of the Courts' exercise of its discretion to deny Dow Jones' application for declaratory relief. The uncertainties surrounding what claims or defenses the parties may or may not interpose in the London Action, what legal principles may or may not apply, and how the British forum ultimately may or may not rule upon the matters before it, not only engender contingencies that diminish the reality and immediacy of the controversy at issue here. Equally pertinent, the incipiency of the foreign proceedings leaves open considerable room for the existence of real and substantial issues regarding claims arising in the United Kingdom whose adjudication under British law by British tribunals, if intruded upon by doubtful orders of this Court, may unjustifiably interfere with the exercise of jurisdiction by tribunals of

**176.** See *Cunningham,* 407 F.2d at 1168; *Basic,* 949 F.Supp. at 1339–40.

**177.** See *Wilton,* 515 U.S. at 280–81, 115 S.Ct. 2137.

**178.** See *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 219 (2d Cir.1978), *rev'd on other grounds,* 652 F.2d 278 (2d Cir.1981); *Federal Ins. Co. v. May Dep't Stores Co.,* 808 F.Supp. 347, 349–51 (S.D.N.Y.1992).

another sovereign nation and thus engender unnecessary tensions between the judicial power of the United States and that of the United Kingdom. In *Brillhart,* the Supreme Court cautioned that "[g]ratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided." [179]

The considerations that prompt the principle of noninterference interference by federal courts with domestic state court proceedings apply with equal cogency in an international context. The potential for friction to occur in this case gives rise to application of the doctrine of international comity, prompting the Court to decline the exercise of jurisdiction and defer to the laws and interests of proceedings in a foreign country, insofar as they are not detrimental to United States interests. [180]

Under somewhat analogous situations, other courts have invoked the principle of comity of nations as a factor in their decision to deny declaratory relief. In *Basic,* the court noted that: "[a] declaratory action would also create friction between federal courts of the United States and New Zealand, and would improperly encroach on the jurisdiction of New Zealand." [181] For these reasons, the court concluded that the "comity of nations" doctrine compelled it to decline to exercise its jurisdiction and instead to defer to New Zealand's court. As the Court noted:

> Because Fitzroy filed the NZ action before Basic filed the Complaint, the New

Zealand court should have the opportunity to render a judgment, or make other decisions regarding its own jurisdictional and pleading rules, without an American federal court "looking over its proverbial shoulder," second-guessing each New Zealand court decision, and predicting possible foreign court judgments. Therefore, for reasons of comity, and ever mindful of "the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts ... may hinder the conduct of foreign affairs," the court finds that the instant action would serve only to interfere with New Zealand's sovereign right to decide cases brought to its own judicial forum. [182]

Finding the *Basic* court's reasoning persuasive, another court confronted with a declaratory judgment action brought by Eastman Kodak Company that involved related proceedings in Bolivia, relied heavily on *Basic* in deciding that, in the interests of comity, it should decline to grant relief intended to preempt the effect of a possible adverse judgment against Kodak in Bolivia. [183] And, in a reverse of the situation in the case at hand, the House of Lords ruled that an anticipatory action commenced in Great Britain to bar antitrust litigation brought in the United States involving the same parties was an inappropriate use of declaratory and injunctive relief. [184] Noting that circumspec-

---

**179.** 316 U.S. at 495, 62 S.Ct. 1173; *see also Wycoff,* 344 U.S. at 247, 73 S.Ct. 236 ("Anticipatory judgment by a federal court to frustrate action by a state agency is even less tolerable to our federalism."); *Beacon Constr.,* 521 F.2d at 397 (noting that in diversity actions "an important consideration in granting declaratory relief is its effect on federal-state relationships.") (citing *Great Lakes Dredge & Dock Co. v. Huffman,* 319 U.S. 293, 298, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943)).

**180.** *See Basic,* 949 F.Supp. at 1340–41.

**181.** *Id.* at 1340.

**182.** *Id.* at 1340–41 (quoting *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l,* 493 U.S. 400, 404, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990)).

**183.** *See Eastman Kodak Co. v. Kavlin,* 978 F.Supp. 1078, 1089 (S.D.Fla.1997).

**184.** *See Laker Airways,* [1985] A.C. at 95.

tion was required in these matters of international comity, one member of the court stated: "The approach has to be cautious because an injunction restraining a person within the jurisdiction of the English court from pursuing a remedy in a foreign court where, if he proves the necessary facts, he has a cause of action is, however disguised and indirect, an interference with the process of justice in that foreign court." [185]

Here, as in *Basic*, the Court considers that by interjecting itself prematurely into the parties' conflict now pending adjudication in the London Action, it would unduly meddle with the orderly administration of justice in the British tribunals. This Court has no basis at this point, other than positing hypotheticals and surmising what the British tribunals may or may not do, for prejudging the outcome of the London Action, or for presuming that the parties could not achieve a satisfactory voluntary settlement of their conflict in that forum.

Even less does the court possess grounds for concluding that the United Kingdom's judiciary, by some assumed reason of incompetence, undue bias in favor of its own laws or nationals, or reflexive predisposition against Dow Jones' claims, would be predictably inclined to hold Dow Jones liable under any conceivable application of British law. Such deterministic augury is not only unwarranted as a foundation for this Court's exercise of discretion to grant the extraordinary relief requested here. More to the point, it is certain to impede the British courts' ability to perform their judicial functions, and hamper their opportunity adjudicate disputes in accordance with their jurisdiction and legal principles, presumably bringing to the task no less commitment to do what is right and just than this court is constitutionally sworn to do.[186]

### 5. Adequate Alternate Remedy

Another principle guiding the application of the DJA derives from the operation of the statute in conjunction with Federal Rule of Civil Procedure 57. That rule expressly provides that the "[e]xistence of another adequate remedy does not preclude a judgment for declaratory relief in cases where appropriate." [187] A corollary of this principle is that a court may lack subject-matter jurisdiction, or may properly exercise its discretion to deny declaratory judgment, in cases where a more appropriate form of relief does exist.[188]

#### a. Pendency of Another Action

One consideration in determining whether another adequate remedy exists is the pendency of another action between the same parties in a forum in which some or all of the same issues raised in the declaratory judgment action are also in dispute. In that event the court considering DJA relief may weigh whether the issues before it could be fully resolved in the other action, and where the issues are likely to be most comprehensively adjudicated.[189] In this regard, " '[t]he tests are whether the issuance of a declaratory judgment will

---

**185.** *Id.* (opinion of Lord Scarman).

**186.** The result of the *British Airways* litigation in the House of Lord, *see id.,* not only manifested the British court's proper recognition of the principle of comity that counseled deference to the litigation pending in the United States court which had exercised proper jurisdiction over the British defendants, but demonstrated the working of the British legal system in that instance to yield an adjudica-

tion that prevented what otherwise may have produced a miscarriage of justice for the plaintiff in the federal antitrust action.

**187.** Fed.R.Civ.P. 57.

**188.** *See Hickmann v. Wujick,* 488 F.2d 875, 876 (2d Cir.1973).

**189.** *See generally* 10B *Wright, Miller & Kane, supra,* § 2758, at 513–19.

effectively solve the problem, whether it will serve a useful purpose, and whether or not the other remedy is more effective or efficient.' " [190]

But the existence of an alternative forum, actual or prospective, presents several additional factors, raised in the instant case, that come into play in assessing the appropriateness of granting declaratory relief. First is the relevance and weight assigned to which action came first, factors of forum shopping and the race to courthouse. The Supreme Court's ruling in *Wilton* may be read to instruct that there can be no mechanistic accrual of rights that attaches by reason of reaching the courthouse first, or indeed of engaging in a race at all.[191] Rather, what counts in the relevant inquiry, among other considerations, is which forum is better and more efficiently equipped to serve the interests and convenience of the parties; whether defenses may be adequately addressed in the alternative forum; whether all of the issues and parties in dispute may be joined and the conflict comprehensively adjudicated.[192]

Second, when parallel actions are being pursued in courts with concurrent jurisdiction, the general rule favors honoring the doctrine of comity that compels deference and mutual respect for the foreign proceedings, even outweighing considerations of avoiding certain hardships and inconveniences, promoting economies of consolidated litigation, or preventing inconsistent adjudications.[193] Whatever potential may exist for an adverse ruling in one forum that conflicts with fundamental public policies of another may be addressed when a final judgment is sought to be enforced.

Third, when such concurrent jurisdiction exists the declaratory judgment action may not be misused as a precipitous means to obtain access to court ahead of an opponent in an alternate action and thereby attempt to defeat an anticipated defense that may be interposed the other forum.[194]

### b. *Comity*

The more sensitive issues raised by the inquiry regarding adequate alternate remedies are those that implicate potential inter-jurisdictional conflict. Specifically, friction may arise from the exercise of federal judicial power in the face of the equally valid jurisdiction of the alternate forum over disputes properly before it.[195] On this point the Supreme Court has counseled that "[i]t is in the public interest that federal courts of equity should exercise their discretionary power to grant or withhold relief so as to avoid needless obstruction with the domestic policies of the states." [196] To these ends, longstanding federal law and policy proscribe federal court injunctions, except where specifically authorized, that would interfere with proceedings in state courts.[197]

Though deriving primarily from issues peculiar to our domestic concept of federalism, these principles are no less pertinent in the context of intercourt judicial

---

**190.** *Id.* at 519 (quoting *Western v. McGehee*, 202 F.Supp. 287, 294 (D.Md.1962)).

**191.** *See id.* § 2758, at 529–30.

**192.** *See Wilton,* 515 U.S. at 283, 115 S.Ct. 2137 (citing *Brillhart,* 316 U.S. at 495, 62 S.Ct. 1173); *Continental Casualty Co. v. Coastal Sav. Bank,* 977 F.2d 734, 737 (2d Cir.1992).

**193.** *See Sabena,* 731 F.2d at 928; *Compagnie des Bauxites,* 651 F.2d at 887.

**194.** *See Wycoff,* 344 U.S. at 247, 73 S.Ct. 236.

**195.** *See, e.g., Great Lakes Dock,* 319 U.S. at 298, 63 S.Ct. 1070.

**196.** *Id.*

**197.** *See, e.g.,* 28 U.S.C. § 2283; *Younger,* 401 U.S. at 43–45, 91 S.Ct. 746.

relations extending beyond national borders.[198] This imperative is recognized in the doctrine of comity already discussed above. Consistent with the spirit of mutual respect and cooperation embodied in the "comity of nations" principle, judicial proceedings in foreign tribunals touching on the laws and interests of other sovereign states should be accorded due recognition in cases where it is appropriate to do so.[199] In *Hilton*, the Supreme Court defined the principle of international comity as "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of [its] own citizens, or of other persons who are under the protection of its laws."[200] In *Cunard S.S. Co. v. Salen Reefer Services AB*,[201] the Second Circuit elaborated that "[c]omity will be granted to the decision or judgment of a foreign court if it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and rights of its residents will not be violated."

The concept of international comity is based on the principle that giving due recognition to acts and proceedings of foreign tribunals promotes international cooperation, strengthens mutual ties, fosters reciprocal treatment and thereby enhances the rule of law on the international scale, both within and among nations. Conversely, just as significant public interests would be harmed by failure to promote harmonious federal-state relations in domestic governmental affairs, relations among nations may also be imperiled, inviting potentially damaging reciprocity, by the refusal of a forum nation to accord due recognition to the proper, fair and orderly proceedings of another country, as long as enforcing the judgment of the foreign tribunal does not frustrate fundamental interests or policies of the domestic forum.[202] On this point, the Supreme Court underscored in a related context "the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder" the conduct of foreign affairs.[203] The doctrine accordingly counsels that absent exceptional circumstances, a federal court in the exercise of its discretion should decline to assert jurisdiction and defer to the corresponding interests and laws of foreign tribunal adjudicating related disputes in proceedings involving the same parties over which they have proper jurisdiction.

Notions of comity come into play with heightened sensitivity in cases where, as here, injunctive relief is sought to bar a litigant from pursuing an action in the courts of a foreign jurisdiction. In these situations, the general rule holds that, except in very narrow, compelling circumstances such as to prevent "an irreparable miscarriage of justice,"[204] there is no justifiable basis for issuing a restraining order for this purpose, especially where the restraint affects the forum where an alleged injury occurred and whose laws are being

---

**198.** *See Sabena,* 731 F.2d at 928, n. 52 (citing *Canadian Filters,* 412 F.2d at 578).

**199.** *See Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895).

**200.** *Id.*

**201.** 773 F.2d 452, 457 (2d Cir.1985).

**202.** *See W.S. Kirkpatrick & Co., Inc. v. Envt'l Tectonics Corp., Int'l,* 493 U.S. 400, 404, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990).

**203.** *Id.* (quoting *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)); *see also Basic,* 949 F.Supp. at 1340; *Eastman Kodak,* 978 F.Supp. at 1078.

**204.** *Sabena,* 731 F.2d at 927.

invoked.[205] As discussed above, the exception has been satisfied in cases where the restraining order is intended to protect the court's jurisdiction, where one party affirmatively seeks to relitigate matters already adjudicated by the first court or otherwise attempts to frustrate the exercise of the court's proper authority in order to evade important public policies of the forum state.[206]

Central to this cautionary rule is the recognition that enjoining such litigation implicates delicate issues of comity and that these considerations demand exceptional care and great restraint.[207] In *Sabena*, Court recognized that: "[e]njoining participation in a foreign lawsuit in order to preempt a potential judgment is a much greater interference with an independent country's judicial processes."[208]

Grounds for particular circumspection derive in large part from the reality that no practical difference exists between an injunction restraining the parties and one addressed to the foreign court itself, thus highlighting the potential for deleterious conflicts with the orderly administration of justice of another sovereign state and for undue hindrance of the conduct of foreign relations.[209] In this light, the deference to a foreign proceeding that comity counsels is not born strictly of obligation or self-preservation. Neither is it compelled by abnegation of judicial power duly con-

ferred, nor by abdication of a sovereign's jurisdictional prerogatives. Rather, due respect for the proper assertion of judicial authority by a foreign court derives from the salutary doctrine, matured into wisdom and near universality by enduring custom and recognition, of "acceptance by common consent of civilized communities of rules designed to foster amicable and workable commercial relations."[210]

Applying these principles here compels a finding that a more appropriate alternative remedy exists for the parties in proceeding with the London Action, and therefore that the Court refrain from encroachment upon the British tribunals. In so ruling, the Court's judgment is not blinded by any Panglosian faith in British justice; decidedly, the world we live in is not "the best of all possible worlds." In a flawed cosmological state, anyone can easily conjure the occurrence of a "worst case" prospect. Like all domestic courts, British tribunals are not internationally constituted; they are creations of national enactments whose mandate is primarily to enforce domestic law and public policy. Despite national commitment to recognize international law as an aspect of domestic law, and to honor comity and other principles compelling cooperation among sovereign states, in cases of conflict or doubt, courts in the final analysis generally place national interests and concerns ahead of foreign interests or international imperatives.[211] As the *Sabena* court observed:

---

205. *See Bryant*, 92 F.2d at 571; *Laker Airways*, 559 F.Supp. at 1129.

206. *See Sabena*, 731 F.2d at 927.

207. *See China Trade*, 837 F.2d at 36; *Computer Assoc.*, 126 F.3d at 371–72.

208. 731 F.2d at 931; *see also Harvey Aluminum*, 203 F.2d at 108 (noting that a district court could enjoin the prosecution of an action in a foreign jurisdiction if the litigation was motivated solely by vexatiousness, but that the restraining order should not be granted if the party had valid grounds to be in the

foreign tribunal under the laws of the country involved).

209. *See Laker Airways*, 559 F.Supp. at 1128 n. 14 (citing *Peck*, 48 U.S. (7 How.) at 624–25 and *Compagnie Bauxites*, 651 F.2d at 887).

210. *Lauritzen*, 345 U.S. at 582, 73 S.Ct. 921.

211. *See Hilton*, 159 U.S. at 165, 16 S.Ct. 139 (noting that " '[I]n the conflict of laws it must often be a matter of doubt which should prevail; and that, whenever a doubt does exist, the court which decides will prefer the laws

"[C]ourts inherently find it difficult neutrally to balance competitive foreign interests."[212]

Thus, this Court could not rule out the possibility, one among many it has factored, that Dow Jones may not prevail in the London Action and subsequent British appellate review on any jurisdictional or substantive defenses asserted, and that a judgment is then entered against Dow Jones that may incorporate legal principles inimical to prevailing American First Amendment jurisprudence and public policy. Even in that event, however, Dow Jones is not without recourse, at least not in this country.

### c. Exception to Comity

The doctrine of international comity admits of a widely recognized exception. As the Supreme Court noted in *Hilton*, " 'comity' . . . is neither matter of absolute obligation . . . nor of mere courtesy and good will. . . ."[213] So circumscribed, comity ceases where a foreign judgment's actual conflict with vital public

concerns of the forum state begins to prejudice or undermine domestic interests. No sovereign state is under unyielding compulsion to enforce the judgments of another nation that are predicated on laws inherently repugnant to fundamental public policies or notion of justice of the forum state, or that do violence to its important domestic interests.[214] Applying these principles, a New York State court has declined to recognize or enforce a judgment rendered in a libel action in the United Kingdom on the ground that the judgment was antithetical to State public policy in that it was founded on legal doctrine contrary to freedom of speech protections embodied in the federal and New York constitutions.[215]

Thus, should the London Action produce a judgment based on application of principles that would vitiate public policies of the United States, Dow Jones will then accrue a justiciably ripe occasion to challenge in a United States jurisdiction any effort to enforce the judgment on the substantive grounds it prematurely interposes here.[216]

---

of its own country to that of the stranger.' ") (quoting Story, *Conflict of Laws* § 28).

**212.** 731 F.2d at 951 (citing Maier, *Interest Balancing and Extraterritorial Jurisdiction*, 31 Am. J. Comp. L. 579, 593–95 (1983)).

**213.** 159 U.S. at 163–64, 16 S.Ct. 139. The *Hilton* Court also stated that: " 'Every nation must be the final judge for itself, not only of the nature and extent of the duty, but of the occasions on which its exercise may be justly demanded.' " and that " '[n]o nation will suffer the laws of another to interfere with her own to the injury of her citizens.' " *Id.* at 165, 16 S.Ct. 139 (quoting Story, *Conflict of Laws*, §§ 33–38); *see also Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir.1971), *cert denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972) (noting that "comity does not achieve the force of an imperative or obligation").

**214.** *See Hilton*, 159 U.S. at 164, 16 S.Ct. 139; *Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 629 (2d Cir.1976); *Sabena* 731 F.2d at 937;

*Tahan*, 662 F.2d at 864 *see also Restatement (Third) of Foreign Relations* § 482(2)(d) ("A court in the United States not recognize a judgment of the court of a foreign state if . . . the cause of action on which the judgment was based, or the judgment itself, is repugnant to the public policy of the United States or of the State where recognition is sought."); *Restatement (Second) of Conflict of Laws* § 117, Comment c (1971) (enforcement will usually be accorded to a foreign nation judgment "except in situations where the original claim is repugnant to fundamental notions of what is decent and just in the State where enforcement is sought.")

**215.** *See Bachchan*, 585 N.Y.S.2d at 665; *see also Abdullah v. Sheridan Square Press, Inc.*, No. 93 Civ. 2515, 1994 WL 419847 (S.D.N.Y. May 4, 1994); *Yahoo!*, 169 F.Supp.2d at 1188–89.

**216.** *See Yahoo!*, 169 F.Supp.2d at 1188–89.

In sum, Dow Jones will have ample opportunity to exercise its right to its day in court, the same right the outcome of this action would effectively deny to its opponent were Dow Jones' strategy to prevail here.

The Court also does not ignore that this course affords relatively modest comfort. As Dow Jones ardently stresses, the eventuality of an adverse judgment in the London Action and attendant burdens is precisely the outcome Dow Jones seeks to avert, for it could well subject Dow Jones to multiplying legal costs and possible prejudgment interest and fees.[217] Insofar as concern over the costs and inconvenience associated with defending litigation is a consideration to be weighed in the context of this case, the Court has addressed it above. There is no satisfactory answer to this apprehension. As already noted, absent extraordinary circumstances not evidenced here, the Court does not read in the DJA, or in the recognized criteria which should guide the exercise of the Court's discretion in granting declaratory relief, a routine purpose or mandate to spare a party subject to potential or actual litigation properly within the jurisdiction of another judicial forum from the costs of defending itself in that other action, however frivolous or vexatious the lawsuit is alleged to be.[218]

Viewed as a whole, the various considerations that guide the Court's exercise of its DJA discretion would weigh heavily in favor of denying relief in this case. Accordingly, the Court grants Harrods' motion to dismiss.

## IV. *PERSONAL JURISDICTION*

The parties devoted considerable portions of their motion papers to arguments over Harrods' Rule 12(b)(2) challenge to the Court's personal jurisdiction over Har-

rods pursuant to New York Civil Practice Law and Rules §§ 301 and 302. In light of the Court's decision granting Harrods' Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, it is not necessary to address the parties' personal jurisdiction dispute.

## V. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that defendants Harrods' motion to dismiss the complaint is **GRANTED**.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

---

**217.** *See* Pl.'s Memo at 16.

**218.** *See Younger,* 401 U.S. at 46, 91 S.Ct. 746.